53 F.3d 1184
 Steven CHRISTOPHER, Jason Christopher, Plaintiffs,
Brenda Mills, as natural guardian of her minor child, Jason
Christopher, Plaintiff-Appellee,
v.
CUTTER LABORATORIES, Defendant,
Armour Pharmaceutical Company, Defendant-Appellant.
 No. 93-3212.
 United States Court of Appeals,
Eleventh Circuit.
 June 2, 1995.
 
 Edward W. Gerecke, Sylvia H. Walbolt, Alan C. Sundberg, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, FL, Douglas F. Fuson, Sara J. Gourley, Sidney & Austin, Chicago, IL, for appellant.
 Jere Martin Fishback, Kleinfeld & Fishback, St. Petersburg, FL, for appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before COX, BLACK and BARKETT, Circuit Judges.
 BLACK, Circuit Judge:
 
 
 1
 This appeal arises from a wrongful death action brought by the natural mother and father of Jason Christopher. Jason suffered from classic hemophilia, a congenital blood clotting disorder. As part of his treatment, Jason used a number of different blood products, including one known generically as Factor VIII concentrate and sold by Appellant Armour Pharmaceutical (Armour) under the trade name Factorate. Jason died of complications from AIDS in February of 1992. Plaintiffs claimed that Jason was infected with the HIV virus by an infusion of Armour's concentrate in late 1983, as a result of Armour's negligent failure to warn Jason's treating physician that its product might transmit AIDS. A jury found in favor of plaintiffs and awarded them damages of $2,007,256.13.
 
 
 2
 We address whether plaintiffs' evidence established sufficient causation for the jury to find in their favor and whether the district court erroneously instructed the jury on Armour's learned intermediary defense.[1] We affirm in part and reverse and remand in part, holding that plaintiffs' evidence established sufficient causation to render a verdict against Armour, but that the district court erred in its jury instructions on the learned intermediary rule by constructing an improper legal standard not supported by the record.
 
 I. PROCEDURAL BACKGROUND
 
 3
 Jason Christopher's parents brought a wrongful death action against Armour, claiming that Armour negligently failed to warn Jason's prescribing physician that Factorate might transmit the HIV virus. Factorate is a biologic, licensed by the Federal Drug Administration (FDA), that contains Factor VIII clotting protein necessary for the treatment of hemophilia. The FDA must approve this biologic for sale. 21 C.F.R. Sec. 601.2(a) (1983). It is available only by prescription through a physician. The written prescribing information packaged with each vial of Factorate must include FDA-approved warnings with respect to potential hazards of use. 21 C.F.R. Sec. 201.57(e) (1983); see 21 C.F.R. Sec. 601.2(a) (1983).[2] Armour cannot change the warnings without the express approval of the FDA. 21 C.F.R. Sec. 601.12(b) (1983).
 
 
 4
 Prior to January 1984, Armour's package labeling did not contain a warning with respect to AIDS. On September 30, 1983, Armour requested a labeling change for Factorate to include the following AIDS warning:
 
 
 5
 The possibility exists that Acquired Immune Deficiency Syndrome, (AIDS), an immunologic disorder with extremely severe consequences, may be transmitted by blood, blood products and blood derivatives, including clotting factors. However, the causative agent has neither been isolated nor identified. This information should be considered in determining patient care and treatment.
 
 
 6
 The FDA approved this proposed change on January 25, 1984.
 
 
 7
 Although plaintiffs did not contest the adequacy of this warning, they claimed that Armour was negligent in not seeking approval of the warning at an earlier time, alleging that Armour had reasonable evidence of a potential risk of transmission of HIV from their product before September 1983. They additionally claimed that Armour was negligent in failing to send an individual letter to physicians, known as a Dear Doctor letter, warning of the risk.[3]
 
 
 8
 In order to carry their burden of proof on causation, plaintiffs had to show that their son was infected with HIV by an infusion of Armour's concentrate, Factorate, during a discrete period of time in which Armour negligently failed to warn the prescribing physician of the possibility of AIDS when it knew that reasonable evidence existed of that risk with its product. Armour asserted that plaintiffs did not prove causation because they did not establish with reasonable medical probability that Jason was infected by Factorate as opposed to the other blood treatments he had received. Armour also argued that Jason's prescribing physician, Dr. Jerry Barbosa, knew of the possibility that AIDS might be transmitted by concentrate when he first treated Jason with Armour's product. Given this alleged knowledge, Armour asserted, under the learned intermediary rule, that any failure to warn Dr. Barbosa of that possibility at an earlier time was not the proximate cause of Jason's infection.
 
 
 9
 The district court denied Armour's Rule 50 motion for judgment as a matter of law, finding sufficient causation to go to the jury. The court also did not give Armour's requested jury instruction on the learned intermediary defense. Initially, the court charged the jury, consistent with Armour's instruction, that Armour had to prove that Dr. Barbosa knew at the time of treatment of the "possibility" that AIDS might be transmitted by blood products, the language contained in the warning subsequently approved by the FDA and conceded as adequate by plaintiffs. The court continued, however, with the presently-challenged instruction that Armour had to prove that Dr. Barbosa knew of "reasonable evidence of an association of a serious hazard, that is, AIDS, with Factor VIII concentrate."
 
 
 10
 After the jury verdict in favor of plaintiffs, Armour filed both a motion for new trial and an alternative motion for judgment notwithstanding the verdict, alleging insufficient causation and error in the jury instructions. The district court, in two lengthy orders, denied both post-trial motions. Armour then appealed.
 
 II. FACTUAL BACKGROUND
 
 11
 Jason Christopher suffered from moderate hemophilia, a disorder in which the afflicted person is subject to spontaneous bleeds that can cause severe arthritis, crippling, or death. The severity of the clotting disorder depends upon the extent to which the hemophiliac lacks a clotting protein in plasma called Factor VIII. To limit or treat bleeding, hemophiliacs must use blood products, donated by others, which contain the missing clotting factor. There are several types of blood products used to treat hemophilia--whole blood, cryoprecipitate, and Factor VIII concentrate--which contain the Factor VIII clotting protein.[4] Over the course of his life, Jason Christopher used all three products.
 
 
 12
 The disease known as AIDS first came to the attention of the United States medical community in 1981.[5] The first report of AIDS in hemophiliacs occurred in July of 1982 when the Center for Disease Control (CDC) reported that three hemophiliacs were diagnosed with AIDS. Although the cause of the new disease was unknown, the CDC report suggested that hemophilia patients might be at risk because of their treatment with blood products. Evidence of the possibility that AIDS might be transmitted through blood products continued to surface through July 1983[6], at which time Armour concluded that there was reasonable evidence of an association of AIDS with blood products and decided to seek FDA approval of a revision to its package labeling. The proposed warning was submitted in September 1983 and approved in January 1984.
 
 
 13
 Armour introduced a new heat-treated concentrate in February 1984. Studies had shown that this heat-treated Factor VIII concentrate might reduce the risk of transmission of non-A, non-B Hepatitis. Although it was not known at that time, the heat-treated concentrate later was shown to protect against AIDS. The heat-treated concentrate contained the identical AIDS warning as approved for the non-heat-treated concentrate.
 
 
 14
 Jason used each type of blood product available for treatment of his hemophilia. Jason's medical records established his use of blood products as follows. In March and April of 1982, he received several units of whole blood and 64 units of cryoprecipitate at military bases in Germany. He received 33 units of cryoprecipitate in Washington, D.C., between April and June of 1982, 6 units in October 1982, and 4 more in January 1983. In total, Jason received 107 units of cryoprecipitate. On three occasions in July 1982, Jason received non-Armour Factor VIII concentrate. In August 1982, he was diagnosed with acute Hepatitis B, caused by one of his earlier treatments with blood products.
 
 
 15
 In February 1983, Jason began treatment with Dr. Barbosa, the chief pediatric hematologist at All Children's Hospital in St. Petersburg, Florida. He received his first Armour concentrate on July 15, 1983, after an injury requiring therapy. Dr. Barbosa treated Jason with two more infusions of Factorate in August and two in November--once on November 10 and once on November 30. On November 29, 1983, Jason developed a flu-like illness, with symptoms including fever, enlarged lymph nodes, and sore throat. After November 30, 1983, Jason received no further concentrate until May of 1984, when he began receiving heat-treated concentrate. Jason tested positive for HIV in late May 1985, developed AIDS in early 1990 and died in February 1992.
 
 
 16
 It was undisputed at trial that Jason could have been infected with the HIV virus by any one of the units of blood products used to treat his condition from May 1982 until May 1984, when the heat-treated concentrate was introduced. In order to prove Jason's infection was caused by Armour's concentrate, plaintiffs introduced the testimony of Dr. Barbosa, Jason's treating physician, and Dr. William Robinson, a professor of medicine with a specialty in infectious diseases, including AIDS and hepatitis.
 
 
 17
 Dr. Robinson's opinion testimony was based upon epidemiological studies and clinical evidence of Jason's symptoms on November 29, 1983. The epidemiological studies used by Dr. Robinson, analyzed HIV infection rates in hemophiliacs using concentrate or cryoprecipitate. There was no dispute that the studies demonstrated an association between AIDS and these products and that, in the populations surveyed, concentrate users had a higher proportion of infection than did cryoprecipitate users. In addition, the studies showed that hemophiliacs using a greater amount of Factor VIII, either concentrate or cryoprecipitate, had a higher incidence of infection than did hemophiliacs using a lesser amount of those products. Dr. Robinson concluded from these studies that "the rate of what patients are infected and the percentage of patients infected in any year is related to in some way to the quantity of Factor VIII that they received."
 
 
 18
 In Dr. Robinson's opinion, in comparison to the hemophiliacs in the studies, Jason received such small amounts of Factor VIII in concentrate or cryoprecipitate that his risk of infection was very low.[7] Nonetheless, based upon the higher incidence of AIDS in concentrate users than in cryoprecipitate users, and based upon the very small amount of cryoprecipitate that Jason used, Dr. Robinson opined that if Jason were infected by either product, it was more likely to have been concentrate. He further testified that Jason was more likely to have been infected from one of his later injections of concentrate than from one of his earlier treatments, concluding that Jason's risk of infection increased as the amount of Factor VIII concentrate he received increased. Consequently, he targeted late 1983 to early 1984 as the time most likely for Jason to have been infected.
 
 
 19
 In addition, Dr. Robinson testified, based on examining Jason's medical records, that the clinical symptoms exhibited by Jason on November 29, 1983, were a likely manifestation of an acute primary HIV infection.[8] Although he conceded that the symptoms were not absolutely diagnostic of such an infection and that they mirrored symptoms of a common cold, Dr. Robinson testified that, in his expert opinion, they were the only ones in Jason's medical history perfectly consistent with a primary HIV infection. Dr. Robinson also opined that this illness was connected with Jason's treatment in early November with Factorate. By November 1983, it had been more than ten months since Jason had received cryoprecipitate or any other blood product except Armour's Factor VIII concentrate. The November 10 Factorate injection was particularly suspect, because Jason's illness occurred nineteen days after that treatment--a time frame fitting within the typical one- to six-week incubation period for HIV.
 
 
 20
 Dr. Robinson acknowledged that he could not determine where an individual patient such as Jason would fall in the epidemiological studies, and that he could not identify to a reasonable medical probability whether a concentrate user was infected by a particular unit of concentrate. He concluded, however, given Jason's clinical symptoms and the incubation period of the virus, combined with the epidemiological studies showing a greater likelihood of infection among concentrate users than among cryoprecipitate users, that Jason more likely than not was infected in November 1983 when he received Armour's Factorate.
 
 
 21
 Dr. Barbosa, Jason's treating physician, testified that, "statistically speaking," Jason "probably" was infected with concentrate rather than cryoprecipitate because concentrate came from thousands of donors unlike cryoprecipitate, which comes from one donor. He further stated that the clinical symptoms that Jason exhibited in November 1983, though consistent with a common cold, were "very suggestive" of primary HIV infection. He did not remember ever seeing those cluster of symptoms in Jason's medical records prior to November 1983.
 
 
 22
 In its defense, Armour presented evidence and testimony to show that even if the jury found it to have issued an untimely warning, its negligence was not the proximate cause of Jason's injury because of the learned intermediary rule. Armour argued that if Dr. Barbosa, when administering Factorate to Jason, had the same knowledge as was issued later in the concededly adequate warning, the jury could find that there was no causal link between its alleged negligence and Jason's infection. Armour introduced evidence that Dr. Barbosa, a board-certified pediatric hematologist/oncologist, kept informed about new developments in his specialty by reading medical journals, going to medical meetings, and conferring with colleagues. Dr. Barbosa admitted that it was "certainly possible" that he had read articles published in early 1983 that suggested the risk of AIDS transmission through blood products. Dr. Barbosa testified that he did not alter treatment of Jason because he was not sure that AIDS was transmitted by Factor VIII and because he had no hard data to make him change his mind.[9]
 
 III. STANDARD OF REVIEW
 
 23
 The standard of review with respect to the district court's denial of Armour's motions for judgment as a matter of law is whether there was substantial evidence of causation, taken in the light and with all reasonable inferences most favorable to the plaintiffs. Lamb v. Sears, Roebuck & Co., 1 F.3d 1184, 1187 (11th Cir.1993). This is a question of law subject to de novo review. Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1469 (11th Cir.1991).
 
 
 24
 A district court has broad discretion in formulating jury instructions. Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533, 1538 (11th Cir.1993). Motions for new trial on the basis of erroneous and prejudicial jury instructions are committed to the discretion of the trial court and reviewed to ascertain whether there has been a clear abuse of that discretion. Pate v. Seaboard R.R., Inc., 819 F.2d 1074, 1077 (11th Cir.1987).
 
 
 25
 This Court examines jury instructions as a whole to determine whether they fairly and adequately addressed the issue and correctly stated the law. Georgetown Manor, Inc., 991 F.2d at 1538. Jury instructions must be put in context; we consider the allegations of the complaint, the evidence presented, and the arguments of counsel when determining whether the jury understood the issues or was misled. Hasenfus v. Secord, 962 F.2d 1556, 1562 (11th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993).
 
 IV. DISCUSSION
 
 26
 On this appeal we address whether plaintiffs' evidence established sufficient causation for the jury to find in their favor and whether the district court erroneously instructed the jury on Armour's learned intermediary defense.
 
 A. Causation
 
 27
 Armour contends that there was insufficient evidence to prove causation and that the district court accordingly was obligated to direct a verdict in its favor. In order to establish a prima facie case in this diversity action, Florida products liability law required plaintiffs to prove by a preponderance of the evidence, with "reasonable medical probability," that Armour's alleged negligence in mid to late 1983 was the proximate cause of Jason's HIV infection. Reaves v. Armstrong World Industries, Inc., 569 So.2d 1307, 1309 (Fla.Dist.Ct.App.1990). In other words, plaintiffs must show that is "more likely than not" that the defendant's act was a substantial factor in bringing about the injury. Id. at 1309 (quoting Gooding v. University Hospital Building, Inc., 445 So.2d 1015, 1018 (Fla.1984)). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." Id. In this case, plaintiffs presented sufficient evidence to prove by a preponderance of the evidence that Armour's alleged negligence was the proximate cause of Jason's infection.[10] See Lamb, 1 F.3d at 1187 (citing Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir.1969) (en banc)).
 
 
 28
 The only portion of Armour's insufficient causation argument that merits discussion is the allegation that the statistical probabilities derived from the epidemiological studies, as analyzed by Dr. Robinson, were not scientifically valid and thus could not be used to determine the time or source of Jason's infection. Upon careful review of Dr. Robinson's testimony, there is no question that several of his statements, viewed in isolation, were statistically invalid[11] and, as such, that the district court should not have admitted them.[12] See Daubert v. Merrell Dow Pharmaceuticals, Inc., --- U.S. ----, ----, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (holding that the trial court must screen experts' evidence to ensure its reliability by conducting a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid ... [and] properly can be applied to the facts in issue"). In many other instances, however, Dr. Robinson made statements that were inconsistent with the allegedly invalid testimony. For example, although he opined that Jason was more likely to be infected in late 1983 because Jason had received increasing amounts of concentrate each year, he also stated--completely opposite to his prior conclusion--that he could not pinpoint which vial of concentrate infected Jason, and that there was not a statistically significant difference between receiving three or six vials of concentrate.
 
 
 29
 As to those instances when Dr. Robinson's testimony could be read to be statistically inaccurate, what is very clear is that Armour made no objections at any time. Armour filed no motion in limine challenging Dr. Robinson's proposed testimony, nor did it raise any contemporaneous objections. In order to preserve this issue on appeal, Armour must have objected to the challenged testimony. See Saunders v. Chatham County Board of Commissioners, 728 F.2d 1367, 1368 (11th Cir.1984).
 
 
 30
 Entering an objection to evidence is not primarily a matter of building a record for appeal or a tactical maneuver by counsel. Its principal purpose is that counsel bring to the attention of the trial judge evidence that counsel considers inadmissible or prejudicial so that, if there is an error involved, the court has a chance to correct it on the spot.
 
 
 31
 Id.
 
 
 32
 What occurred in this case provides a classic example of why contemporaneous objections need to be made. Some of Dr. Robinson's testimony could have been read to be inaccurate and inconsistent, but he was afforded no opportunity to clarify the apparent inconsistencies. If Armour believed that Dr. Robinson's testimony was statistically invalid, it should have objected to that testimony, giving him the chance to explain his answers. Objecting also would have provided the district court with the opportunity not only to make a ruling on the accuracy and admissibility of the challenged testimony but also to clarify that testimony.
 
 
 33
 Absent an objection, we can review the challenged evidence only for plain error. Id. "Plain errors are obvious and substantial errors which seriously affect the fairness, integrity or public reputation of judicial proceedings." United States v. Hope, 901 F.2d 1013, 1020 (11th Cir.1990), cert. denied, 498 U.S. 1041, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). In reviewing all of the evidence and Dr. Robinson's entire testimony, including those statements that clearly were inconsistent with the allegedly invalid testimony, we hold that the district court did not commit plain error.
 
 B. Jury Instruction
 
 34
 Armour rested its primary defense on the learned intermediary rule. It requested a specific jury instruction, which was denied, and now challenges the instruction that was given. Armour contends that the district court utilized an incorrect standard and misled the jury as to the governing law, thus depriving Armour of its affirmative defense. Before addressing the challenged instruction, we first review the learned intermediary rule in order to clarify the defense upon which the instruction was based.
 
 
 35
 The learned intermediary rule is a corollary to the rule that a manufacturer of prescription drugs or products discharges its duty to warn by providing the physician with information about risks associated with those products. Felix v. Hoffmann-LaRoche, Inc., 540 So.2d 102, 104 (Fla.1989). The manufacturer's duty to warn of drug hazards runs to the physician, not directly to the patient. Id. The learned intermediary rule provides that the failure of the manufacturer to provide the physician with an adequate warning of the risks associated with a prescription product is not the proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warning should have communicated. Id. at 105; Zanzuri v. G.D. Searle & Co., 748 F.Supp. 1511, 1517 (S.D.Fla.1990). Thus, the causal link between a patient's injury and the alleged failure to warn is broken when the prescribing physician had "substantially the same" knowledge as an adequate warning from the manufacturer should have communicated to him. Tatum v. Schering Corp., 795 F.2d 925, 928 (11th Cir.1986).
 
 
 36
 Armour challenges the jury instruction, alleging that the charge imposed a burden of proof greater than that required to defeat proximate cause under the learned intermediary rule. According to the rule, if Dr. Barbosa, the prescribing physician, had substantially the same knowledge as Armour's warning would have communicated to him, then there would be no proximate cause between Armour's alleged negligence and Jason's infection. See Tatum, 795 F.2d at 928. Armour's warning stated that:
 
 
 37
 The possibility exists that Acquired Immune Deficiency Syndrome, AIDS, an immunologic disorder with extremely severe consequences, may be transmitted by blood, blood products and blood derivatives, including clotting factors. However, the causative agent has neither been isolated not identified. This information should be considered in determining patient care and treatment. (emphasis added).[13]
 
 
 38
 Armour contends that in order to sustain its burden on the learned intermediary defense, it needed only to prove that Dr. Barbosa had substantially the same knowledge of the AIDS risk as would have been disclosed in the information set forth in this warning. Armour therefore requested the district court to charge the jury on its affirmative defense with an instruction that would reflect the warning's language.
 
 
 39
 In addition to the requested charge, the district court instructed the jury that its "verdict would be for Armour if [it] found by the greater weight of the evidence that Jason Christopher's hemophilia treater, that is, Dr. Barbosa, knew himself at the time in question that there was reasonable evidence of an association of a serious hazard, that is, AIDS, with Factor VIII concentrate." (emphasis added). Armour asserts that the "reasonable evidence" language did not reflect the information set forth in its warning but instead distorted the learned intermediary rule by forcing Armour to prove that Dr. Barbosa had a level of knowledge greater than that disclosed by the warning. According to Armour, its warning would have communicated to Dr. Barbosa exactly what it stated--that the "possibility exists" that AIDS could be transmitted through blood products; if it was proven that Dr. Barbosa had substantially the same knowledge as in that warning, then Armour could have prevailed. Armour argues that the warning would not have communicated the additional knowledge that there was "reasonable evidence" of an association of AIDS with Factor VIII concentrate and that by including this language in the jury charge, the court imposed a higher and erroneous layer of proof on its affirmative defense.
 
 
 40
 Plaintiffs' position is that federal regulations required Armour to initiate a warning change upon finding reasonable evidence of an association of its drug with a serious hazard. 21 C.F.R. Sec. 201.57(e). They contend that the issuance of a warning from a pharmaceutical company, separate from the language therein, communicates to the physician that there is reasonable evidence of an association of serious adverse reactions with the product at issue because the manufacturer would not be permitted to issue any warning unless it had such evidence. (Red Brief at 41). See 21 C.F.R. Sec. 201.57(e). Plaintiffs reason that, in addition to the language of Armour's warning, which would have conveyed to Dr. Barbosa that the "possibility existed" of a risk of AIDS transmission, the warning standing alone would have communicated to him that "reasonable evidence" of the risk existed. They thus conclude that the inclusion of the standard in the jury charge was proper.
 
 
 41
 If the treating physician understood that a warning is issued only after a manufacturer has reasonable evidence of a serious hazard, the existence of a warning, regardless of its language, would communicate that information to the physician. In that circumstance, equating the physician's knowledge of the risk with the manufacturer's knowledge for the purposes of the learned intermediary rule, as the district court did here, would be appropriate. The manufacturer's statutory duty based on its knowledge of reasonable evidence of a risk, however, is wholly unrelated to the physician's knowledge of the risk if the physician did not demonstrate that the warning conveyed that information to him. Absent additional knowledge of the manufacturer's obligation, the standard under the learned intermediary rule remains whether the physician had substantially the same knowledge as would have been communicated in the actual warning, and any jury instruction given should reflect that standard.
 
 
 42
 "The purpose of jury instructions is to give the jury a clear and concise statement of the law applicable to the facts of the case." Pesaplastic, C.A. v. Cincinnati Milacron Co., 750 F.2d 1516, 1525 (11th Cir.1985) (quoting Hanover Fire Insurance Co. v. Sides, 320 F.2d 437, 444 (5th Cir.1963)). In order to assess the propriety of the jury instruction in light of the facts of this case, we must determine if there was any evidence that Armour's warning would have communicated to Dr. Barbosa that there was reasonable evidence of an association between AIDS and blood products. See Bank South Leasing, Inc. v. Williams, 778 F.2d 704, 706 (11th Cir.1985) (stating that there must be evidence adduced at trial to support the giving of an instruction). Here, the district court's charge to the jury regarding Dr. Barbosa's knowledge would have been appropriate only if there were a factual basis for the charge. Such a basis could have been testimony by Dr. Barbosa that he was aware of the reasonable evidence standard or that warnings from drug companies conveyed such information to him.
 
 
 43
 Not only was there no testimony that physicians in general understood the reasonable evidence regulatory standard, there was no testimony that Dr. Barbosa was aware of such a standard. Absent knowledge of the underlying standard, the only information that Armour's warning possibly could have conveyed to Dr. Barbosa was the language contained therein--that the "possibility existed" of an association between AIDS and blood products. The reasonable evidence standard thus was irrelevant to Dr. Barbosa's knowledge of the risks associated with Factor VIII and should not have been included in the jury instruction on the learned intermediary defense.
 
 
 44
 If there is no basis in the record for the instruction given, such error may raise a "substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations," and reversal may be required. McElroy v. Firestone Tire & Rubber Co., 894 F.2d 1504, 1509 (11th Cir.1990) (quoting National Independent Theatre Exhibitors, Inc. v. Charter Financial Group, Inc., 747 F.2d 1396, 1402-03 (11th Cir.1984), cert. denied, 471 U.S. 1056, 105 S.Ct. 2120, 85 L.Ed.2d 484 (1985)). Given the complete lack of evidence in the record to support the inclusion of the reasonable evidence standard in the instruction, we hold that the district court erred by inaccurately charging the jury on Armour's affirmative defense. Cf. Bank South Leasing, 778 F.2d at 706 (holding that the district court erred in failing to properly charge the jury on defendants' affirmative defenses).
 
 
 45
 In some instances, even an inaccurate instruction may not mandate reversal. If the totality of the instructions "properly express the law applicable to the case, there is no error even though an isolated clause may be inaccurate, ambiguous, incomplete or otherwise subject to criticism." Somer v. Johnson, 704 F.2d 1473, 1478 (11th Cir.1983) (quoting Johnson v. Bryant, 671 F.2d 1276, 1280 (11th Cir.1982)). In order to place this jury instruction in context and to determine whether it might have prejudiced Armour by confusing or misleading the jury as to the applicable principles of law, see Pate, 819 F.2d at 1077, we have carefully examined the record, including the allegations of the complaint and counsels' arguments, Hasenfus, 962 F.2d at 1562. Although an inaccurate instruction may be harmless in the context of the whole trial, this was not such a case.
 
 
 46
 Because the learned intermediary rule was the heart of Armour's defense, it was critical that the court properly guide the jury as to the standard to be applied. Mid-Texas Communications Systems, Inc. v. American Tel. and Tel. Co., 615 F.2d 1372, 1386-87 (5th Cir.), cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980).[14] "A defendant is entitled to have the court instruct the jury on the theory of the defense, as long as it has some basis in the evidence and has legal support." United States v. Hedges, 912 F.2d 1397, 1405-06 (11th Cir.1990) (quoting United States v. Orr, 825 F.2d 1537, 1542 (11th Cir.1987)). Failing to properly charge the jury on a defense theory may constitute reversible error. See Hedges, 912 F.2d at 1405-06. We review the trial in its entirety to determine the prejudicial effect of this instruction. See Hasenfus, 962 F.2d at 1562. In this case, not only did the court charge the jury with an instruction not supported by evidence adduced at trial, plaintiffs' counsel reinforced the improper jury instruction by stressing the reasonable evidence standard in his closing argument.[15] Given the importance of this instruction to Armour's primary defense, the reiteration of an unsupported and irrelevant standard in closing argument strengthens our certainty that the jury was improperly guided in its deliberations. See Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1372 (5th Cir.1981).
 
 
 47
 Upon examining the totality of the instructions and after carefully reviewing the record, we are left with a substantial and ineradicable doubt that the jury was properly instructed and hold that the district court erroneously charged the jury on a standard not supported by evidence adduced at trial. As the district court erroneously instructed the jury on Armour's defense, a new trial is required.
 
 V. CONCLUSION
 
 48
 Because we find that plaintiffs presented sufficient evidence for the jury to find that Armour's Factorate was the cause of Jason Christopher's infection, we affirm the district court's denial of Armour's motion for judgment notwithstanding the verdict on the issue of causation. We also affirm the district court's denial of Armour's motion for a new trial based on allegedly erroneous missing witness arguments. The district court's improper jury instruction on the learned intermediary rule, however, constitutes reversible error and mandates a new trial.
 
 
 49
 AFFIRMED in part, REVERSED and REMANDED in part.
 
 
 50
 BARKETT, Circuit Judge, concurring in part, and dissenting in part:
 
 
 51
 I agree with the majority's conclusion that the plaintiffs' evidence established sufficient causation to support a verdict against Armour. I believe the majority errs, however, in concluding that reversal is warranted because of the jury instruction given regarding the learned intermediary defense. The majority's error, in my judgment, lies in confusing matters of law and matters of fact. An error in jury instructions is reversible where the appellate court is left with "a substantial and ineradicable doubt" as to whether the jury was properly guided in its deliberations regarding both the law and the issues. Pate v. Seaboard R.R., Inc., 819 F.2d 1074, 1080-81 (11th Cir.1987). I do not believe such doubt exists here.
 
 
 52
 The relevant law, 21 C.F.R. Sec. 201.57(e) (1982), is unusually clear and precise. It provides that pharmaceutical companies "shall" revise labeling to include a warning as soon as there is "reasonable evidence" of an association of serious adverse reactions and potential safety hazards with a drug.[1] The instruction given was a correct statement of the law. The instruction correctly required Armour to demonstrate that Dr. Barbosa possessed the same reasonable evidence of associated risk that Armour possessed. Armour, at a minimum, legally had to have reasonable evidence to issue the warning. Thus, to be a learned intermediary and to possess the same evidence of associated risk that Armour had, Dr. Barbosa, at a minimum, had to have reasonable evidence of the risk.
 
 
 53
 The majority confuses matters of law and matters of fact by requiring evidentiary support for inclusion of the reasonable evidence standard in the learned intermediary instruction. However, as noted, the legal standard contained in the instruction was properly determined by the district court as a matter of law; the only factual matter for the court was whether defendant had adduced sufficient evidence to support the giving of the instruction. See Bank South Leasing, Inc. v. Williams, 778 F.2d 704, 707 (11th Cir.1985) (defense instruction warranted where evidence sufficient for jury to find in favor of defense based on instruction).[2]
 
 
 54
 Even if one accepts the majority's view that inclusion of the reasonable evidence standard required evidence that Dr. Barbosa knew the legal definitional requirements for an FDA warning, Dr. Barbosa's testimony would seem to be precisely the "factual basis in the record" that the majority claims is needed to support the instruction given. Dr. Barbosa's testimony plainly supports the conclusion that he knew the import of warnings from drug companies.[3] Moreover, as a matter of judicial notice,[4] it is beyond doubt that Dr. Barbosa, as a board-certified pediatric oncologist, would have been aware that reasonable evidence was required before a warning could be issued.[5]
 
 
 55
 In addition, Armour's argument ignores not only the law but the public policy behind the law. Armour argues, and the majority implicitly accepts, the proposition that Dr. Barbosa must be a learned intermediary simply because "all of the medical evidence which plaintiffs contended disclosed this risk to Armour was as equally available to Dr. Barbosa as it was to Armour." If doctors had to independently investigate the properties of all the medicines they use, a drug company would never be required to warn, and there would be no need for the comprehensive framework of federal law controlling the use of medicines or the FDA regimen regulating drug warnings.[6]
 
 
 56
 The underlying rationale of all the cases in which drug companies are required to warn physicians is that although drug companies and clinical physicians both work in the medical field, the drug company is the entity expected to have specific expertise in the use of a product by virtue of its focused research on the product. Thus, although a physician will be generally aware of the properties of a drug he or she administers, he or she will not be expected to have the same technical expertise in the scientific study of the drug as the manufacturer has, notwithstanding that the body of medical evidence about the drug may theoretically be "equally available" to everyone in the medical field. When a physician does have that specific information and has been warned of the hazards of the drug, then, of course, a specific drug company warning would be superfluous. For example, in Felix v. Hoffman-LaRoche, Inc., 540 So.2d 102 (Fla.1989), the physician testified that he fully understood the warnings and also had prior knowledge of the hazardous nature of the drug. As a result, the Florida Supreme Court reasoned that the drug manufacturer could not be penalized for the failure of the doctor to impart knowledge concerning the dangers of the drug of which the doctor had been warned and was aware. Id. at 105. We do not have such a situation here.
 
 
 57
 Because the learned intermediary instruction correctly stated the law and adequately presented the issue, I have no doubt that the jury was properly guided in its deliberations on the defense. Even accepting the majority's approach, I believe that the evidentiary record and judicial notice support the propriety of the instruction given.
 
 
 58
 For these reasons, I respectfully DISSENT.
 
 
 
 [1]
 The third issue on appeal, whether the district court erroneously allowed plaintiffs' counsel to make missing witness arguments, has no merit, and we will not address it in this opinion
 
 
 [2]
 In 1983 21 C.F.R. Sec. 201.57 provided:
 Specific requirements on content and format of labeling for human prescription drugs.
 ...
 e) "Warnings": Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.
 Id. (emphasis added).
 
 
 [21]
 C.F.R. Sec. 601.2(a) requires manufacturers to apply for FDA approval in order to obtain a product license
 
 
 [3]
 Dear Doctor letters are letters which the manufacturers elect to send to physicians using their products. The letters explain certain aspects of those products or advise the physicians as to situations that might affect their use or prescription of a product. According to defendant's expert witness, Dr. Michael Rodell, FDA approval must be sought prior to issuing such a letter, as it is considered a change in package labeling. The FDA regulations require a certain format for these letters so that they will be promptly recognized and read. 21 C.F.R. Sec. 200.5 (1983)
 
 
 [4]
 Whole blood is obtained from a direct blood donation and is used rarely because of the small amount of clotting Factor VIII and the potential for fatal vascular overload and congestive heart failure. Cryoprecipitate is made by freezing blood plasma from one donor, thawing it, and drawing off a precipitate rich in Factor VIII. Cryoprecipitate must be specially frozen and administered through intravenous fluids at a hospital; the amount of clotting factor each unit contains is unknown. Factor VIII concentrate--at issue here--is processed from frozen plasma donated by thousands of donors. The clotting factor is extracted from the pool of combined plasma, freeze-dried, and refrigerated until use. For use, the concentrate is reconstituted with sterile water and injected into the patient's veins. Concentrate contains known amounts of clotting factor and can be administered easily outside the hospital setting
 
 
 [5]
 AIDS is transmitted by a virus known as HIV, which invades the body's immune system. Within each person's immune system are two types of T cells, which assist the body in fighting off infectious diseases--T4 cells, needed for the formation of antibodies, and T8 cells, used to suppress the formation of antibodies. T4 and T8 cells exist in a ratio of about 1.5:1. HIV attacks and depletes the T4 cells, causing an abnormal T-cell ratio and rendering the infected person unable to fight off other infectious diseases. Most of the complications from the HIV virus are related to infections that people with normal immune systems can withstand
 
 
 [6]
 In July of 1982, several meetings were held to discuss the possibility that hemophiliacs using concentrate were at risk for AIDS. In November of 1982, the CDC urged health care providers who worked with blood to take precautions because of a possible agent involved in AIDS. This report was followed by widely published reports that at least six other hemophiliacs had developed AIDS. The National Hemophilia Foundation issued a Medical Bulletin on December 21 warning physicians and patients that there was "an increased concern that AIDS may be transmitted through blood products." In January of 1983, several articles were published in medical journals about the possible causes of the transmission of AIDS, and linking abnormal T-Cell ratios to those hemophiliacs using concentrate. By May 1983, fourteen cases of AIDS among hemophiliacs had been reported to the CDC
 
 
 [7]
 Dr. Robinson relied on a study published in the New England Journal of Medicine written by James Goedert. The study concerned HIV infection and the development of AIDS in hemophilia patients. The study concluded that the majority of persons in the study with hemophilia became infected through the use of commercial clotting concentrate prior to the self-exclusion of donors from high risk groups and prior to heat-treating of such concentrate. Dr. Robinson also used a study by Waskin published in the Western Journal of Medicine in 1986. He concluded from both studies that patients using a greater quantity of Factor VIII were infected at a greater rate. He further noted that those groups studied had a much higher usage of concentrate and cryoprecipitate than Jason did, and that the probability Jason that would have been infected thus was less than for these groups
 
 
 [8]
 After exposure to the HIV virus, a person typically will develop an illness known as primary HIV infection within one to six weeks. The symptoms of this illness may include malaise, fatigue, headache, sore throat, fever, rash, enlarged lymph nodes, vomiting and diarrhea
 
 
 [9]
 Armour also presented medical records of another one of Dr. Barbosa's hemophiliac patients, Johnny Kellar, whom he treated with concentrate at the same time as Jason Christopher. Kellar was a severe hemophiliac who had a history of potentially fatal brain bleeds. Dr. Barbosa took him off of prophylactic use of concentrate in May of 1983. Dr. Barbosa tested Kellar for low T-cell counts and admitted he was concerned that Kellar's immune system might show the same changes as hemophiliacs with AIDS. The mention of AIDS in these records indicated that Dr. Barbosa might have had knowledge about the possibility of the risk of AIDS transmission through blood products
 
 
 [10]
 Plaintiffs presented substantial evidence to satisfy its burden of proving causation. For example, Dr. Robinson testified that in his opinion "within a reasonable degree of medical probability", the injection of Factor VIII concentrate which most likely infected Jason with the AIDS virus was the one administered on November 10, 1983. Dr. Robinson identified and discussed the combination of factors that led to his expert opinion that November 1983 was the most probable time of infection. These factors included: (1) the quantities of Factor VIII concentrate that Jason received in various years; (2) the chronology or pattern of Jason's increasing use of Factor VIII; and (3) the fact that Jason's medical history exhibited an illness consistent with an acute primary HIV infection in November 1983--within the time period appropriate for the incubation period of infection to primary illness
 In addition to Dr. Robinson's testimony, plaintiffs presented oral testimony and scientific articles published in medical journals to establish that there was a smaller probability that treatment with cryoprecipitate, as opposed to treatment with concentrate, would transmit the AIDS virus.
 
 
 [11]
 At several points, Dr. Robinson seemed to assert that the risk of getting the HIV virus from any individual infusion of concentrate increased cumulatively with each succeeding infusion. Such a statement is statistically invalid, as the infusions were independent, not cumulative events
 
 
 [12]
 Generally, this Court reviews the district court's determinations of admissibility of evidence for abuse of discretion. United States v. Cohen, 888 F.2d 770, 774 (11th Cir.1989)
 
 
 [13]
 At trial plaintiffs did not challenge the adequacy of the language contained in the FDA-approved AIDS warning issued by Armour in February 1984. Although they now claim that they did not concede its adequacy, we note that the district court, without objection, charged in its instructions to the jury,
 that plaintiff makes no claim that the language of the warning was inadequate. It's the plaintiff's claim that the means of delivering the warning and its timeliness were inadequate.
 For the purposes of this appeal, we will consider the warning adequate.
 
 
 [14]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981
 
 
 [15]
 Plaintiffs' counsel revisited testimony in which Dr. Barbosa stated that, regardless of his independent knowledge from medical journals that there was an association of AIDS with Factor VIII concentrate, he would not have changed Jason's treatment unless he had received a written warning from Armour stating that they had reasonable evidence of a potential risk of AIDS transmission through concentrate
 
 
 [1]
 The regulation states in pertinent part:
 Specific requirements on content and format of labeling for human prescription drugs.
 ...
 (e) "Warnings": Under this section heading, the labeling shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should be taken if they occur. The labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.
 
 
 [21]
 C.F.R. Sec. 201.57(e) (1982) (emphasis added)
 
 
 [2]
 Bank South, upon which the majority relies, simply provides that evidence must exist in the trial record to support the giving of an affirmative defense instruction. Bank South, 778 F.2d at 707. It does not discuss the content of an instruction
 
 
 [3]
 Dr. Barbosa's testimony demonstrates that he was intimately acquainted with the warnings from drug companies and with the information that such warnings are used to convey:
 Q: How are you kept informed about new hazards or side effects which may come to light associated with a particular pharmaceutical product?
 A: Well, if there's a significant hazard or side effect, usually the pharmaceutical company takes care of immediately notifying us.
 Q: What sort of volume of materials do you receive from pharmaceutical companies each week?
 A: It's really variable. Sometimes nothing during the week, some other weeks several mailing [sic ].
 Q: How are they usually delivered?
 A: It depends on the urgency of the situation. There's usually what they call a Dear Doctor letter [sic ] is called a mailgram or in the envelope you will see the sign "URGENT--important information for the practice inside, read it."
 Q: Let me just show you an envelope that you provided me. Is this similar to what you receive [sic ] a Dear Doctor letter in in [sic ] appearance?
 A: Yes, sir. Here's a red star; the starting [sic ] medical jargon is "URGENT."
 Q: Well, let's talk about the particular years 1982 through 1985. If during those years some new hazard arose associated with a particular pharmaceutical product, how would you expect to find out about it?
 A: It would depend on the urgency of the situation. If a situation was serious enough to warrant immediate attention, you would expect that the pharmaceutical company would be in immediate touch with us.
 Q: By what means?
 A: Either by personal visit or by the means just showed.
 Q: Are you speaking about this type of letter?
 A: Yes, sir.
 Q: How often do you read the Dear Doctor letters that arrive at your office?
 A: Letters like the one I just showed, I open them immediately, sir.
 Q: Why?
 A: Because they [sic ] supposed to bring urgent or very important information.
 Moreover, the trial record contains testimony by Dr. Barbosa in which he clearly states that he would have ceased treating Jason with concentrate had he received such a warning letter or visit from Armour:
 Q: Okay. Let me ask you this question, Doctor: Back in July of 1983 when Jason got his first concentrate from you, if you had received a written warning from Armour Pharmaceutical Corporation indicating that there was a potential AIDS risk associated with its factor VIII concentrate product, how would that have impacted your care and treatment of Jason?
 A: It would have changed the care, sir.
 Q: We know Jason received six injections of non-heat treated concentrate in the last half of 1983. Had you received a warning of a possible risk of AIDS transmission via concentrate from Armour prior to giving those injections, would you have given them?
 A: No.
 Q: What would you have done?
 A: Given cryoprecipitate.
 
 
 [4]
 Even ignoring Dr. Barbosa's conspicuous testimonial evidence, this court must take judicial notice of certain facts not explicitly discussed by the trial court. Under Rule 201 of the Federal Rules of Evidence, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED.R.EVID. 201(b). Moreover, "judicial notice may be taken at any stage of the proceedings, whether in the trial court or on appeal." 56 F.R.D. 183, 206. As this court has recently recognized, "[a]ppellate courts have a special need to resort to facts not found in the record. When the question before the court is not merely the rights of the parties, but the interests of others who may be affected by the rule the court makes to govern the case, it would be foolish for the court to rely only on the evidence the parties have chosen to prove below." Nipper v. Smith, 39 F.3d 1494, 1498 n. 1 (11th Cir.1994) (en banc ) (quoting 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence Sec. 5102, at 462 (1977))
 
 
 [5]
 It cannot be reasonably disputed that Dr. Barbosa, as a specialist in pediatric hematology-oncology, would be acquainted with the warning letters of drug companies and with the evidentiary standards that cause such warnings to be issued. In this regard, the trial record plainly indicates that Dr. Barbosa was a medical doctor, licensed to practice medicine by the state of Florida. It also indicates that he was nationally licensed, that is, he was "board certified" in pediatric hematology-oncology, had the largest pediatric hematology practice in Florida and probably the fourth largest in the southeastern United States, and, as the majority observes, was the Medical Director of the Department of Hematology-Oncology at All Children's Hospital in St. Petersburg, Florida. When physicians are licensed in this way, they are licensed to work with medicines, including state-controlled pharmaceutical products such as factor VIII concentrate and cryoprecipitate. They are so licensed in part because the state has found them to be proficient in the usage of drugs and medicines and knowledgeable about their regulation by the FDA; absent such proficiency and knowledge, one simply cannot be a practicing clinician in Florida or any other state. As it happens, Dr. Barbosa "demonstrated" in the trial testimony cited in the foregoing that he is knowledgeable about regulatory practices as regards blood clotting products. But even if he had not, it would have been implicit in the recitation of his credentials
 
 
 [6]
 See 21 U.S.C. Secs. 301 et seq.; 42 U.S.C. Sec. 262; 21 C.F.R. Sec. 200.5 (1994); id. Sec. 201; id. Sec. 601.12