**F I L E D**
United States Court of Appeals
Tenth Circuit

**JAN 22 2001**

**PATRICK FISHER**
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

MARK MACSENTI,

      Plaintiff-Appellee and Cross-
      Appellant,

v.

JON D. BECKER, D.D.S.

      Defendant-Appellant and Cross-
      Appellee,

HEATHER DAVIS,

      Defendant.

Nos. 98-6485, 99-6012

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CV-97-1398-C)**

Robert Todd Goolsby, Goolsby, Olson & Proctor, Oklahoma City, Oklahoma (Kirk Olson and David Proctor with him on the briefs) for Appellee and Cross-Appellant.

Jack S. Dawson, Miller Dollarhide, Oklahoma City, Oklahoma, (James A. Scimeca and Steven E. Bracklein with him on the briefs) for Appellant and Cross-Appellee.

Before **EBEL, HOLLOWAY** and **HENRY**, Circuit Judges.

**HOLLOWAY**, Circuit Judge.

Plaintiff/appellee Mark Macsenti sued his dentist, defendant/appellant Jon Becker, and Becker's assistant, Heather Davis, for injuries he allegedly suffered during a 1996 dental procedure performed in Becker's office in Clinton, Oklahoma. Macsenti sought relief under theories of negligence and intentional infliction of emotional distress, *inter alia*. Jurisdiction in the district court was based on diversity of citizenship. At the close of the plaintiff's evidence, the district judge granted judgment as a matter of law in favor of Heather Davis, but denied a motion by Becker for such a judgment. (Hereinafter in this opinion we will use "defendant" only to refer to Dr. Becker.) The jury ultimately awarded compensatory and punitive damages to plaintiff Macsenti, and Becker's post-trial motions challenging the verdict were denied. Becker now brings this appeal from the district court's judgment, invoking our jurisdiction under 28 U.S.C. § 1291. The cross-appeal of plaintiff challenges the denial of prejudgment interest by the trial judge.

**I**

Defendant Becker had a dental practice in Clinton, Oklahoma. Plaintiff Macsenti went in to defendant's office for removal of one molar and for dental implants on July 15, 1996, about 9:00 a.m., a procedure expected to take no more than three hours. The procedure was not begun until plaintiff had already been in the office for some time. Defendant had decided to place plaintiff under "conscious sedation" for the procedure, and the first thing done was to order medications, which were picked up from a local

pharmacy. About 11:00 a.m. plaintiff was given the medications, whose trade names were halcion and mepergan fortes. According to plaintiff's evidence, he was also put on nitrous oxide at the same time and remained under nitrous oxide for most of the remainder of the day and evening. One of plaintiff's experts, Dr. Sullivan, testified the particular procedure defendant was to perform should take less than an hour. III App. at 661. The procedure could have been done without the use of halcion, mepergan fortis and nitrous oxide. *Id.* at 662.

Ms. Shirley Teague testified that the day of plaintiff's procedure was the first and last day of her employment as defendant's dental assistant. II App. 343. Ms. Teague had recently completed a "dental lab" program at Moore/Norman Vo-Tech School for one year. On July 15, 1996 Heather Davis was at defendant's dental office, and she showed Teague how he liked his tray of instruments set up. Teague saw plaintiff Macsenti first around 11:00 a.m. *Id.* at 345. Teague and Davis assisted Dr. Becker with a couple of other patients early that day. According to Teague, however, Davis was not present after defendant actually began to work on plaintiff. After Macsenti came in, Teague and Davis took him into cubicle 2, Davis draped him with a cloth in the chair and gave him medication. Davis put the nitrous oxide on him, turned it on and they left Macsenti there. *Id.* at 346. At 1:00 p.m. Ms. Davis took the nitrous oxide off of Macsenti, sat him up, and gave him another pill. *Id.* at 347. Shortly after that, plaintiff Macsenti was laid back down, and Dr. Becker and Teague began the procedure on him, which consisted of doing

dental implants. *Id.* The first part of the procedure went well but was "just slow going." *Id.* at 348. When Dr. Becker started the second post holes, he pushed away from the patient. Dr. Becker had rollers on his chair and he "pushed away from the patient . . . pushed away and passed out . . . he pushed away and dropped the drill. He was just out cold." *Id.*

Teague said that she was stunned and did not know what to do. Dr. Becker was out for a while, ten minutes or so. He woke up and started the procedure again. *Id.* Defendant Becker used the drill again on Macsenti, and did not re-sterilize it before he used it on him. He started again, but he did not last long because he passed out again. *Id.* at 349. He woke back up and started again and passed out again. Teague said that she shook defendant, woke him up and asked him to step out in the hall. *Id.* at 349-50. To this point in time, defendant Becker had passed out about three times. Becker's appearance at this time was that he was staggering and as he got up to leave, he fell and knocked the tray off. Plaintiff Macsenti was still on nitrous oxide. Teague said that in the hall she had a conversation with defendant Becker, telling him she was concerned for him and the patient. She testified that defendant Becker said he was tired, that he had stayed up all night and was writing a thesis. *Id.* at 350. Ms. Teague said that defendant Becker assured her everything would be all right and they went back in and Teague picked up the equipment on the floor and got more sterilized packages and they started the procedure again.

-4-

Defendant passed out again, and this happened several times. *Id.* at 351. Teague asked Ms. Callaway, the receptionist, where Heather Davis was, and was told that Davis and Mrs. Becker had left and were in Oklahoma City. Teague asked Ms. Callaway if Becker had any medical problems such as diabetes or if he was on drugs, but Ms. Callaway did not know and said that this condition had never happened before. *Id.* at 351-52. At these times, plaintiff Macsenti was still on nitrous oxide. Every time they started the procedure again, defendant Becker would pass out. Ms. Teague said that her idea was that Dr. Becker passed out or fell asleep "10 or 15 times . . ." *Id.* at 352. This was all while plaintiff Macsenti was on nitrous oxide. *Id.* At about this time Dr. Becker's daughter came to the office for some money, and Teague sent her to get some coffee for Dr. Becker. Teague put Dr. Becker in cubicle 1, and he went to sleep there for approximately 30 minutes. *Id.* Teague shook Becker to wake him up, spilled some coffee on him , and Becker "giggled" at Teague.

Dr. Becker had a problem with his headlight about 3:30 or 4:00 p.m. Teague testified that she had a conversation with Dr. Becker's wife on the phone, explaining to her that Dr. Becker was literally passing out, and Mrs. Becker told Teague that she should handle the problem, that Heather Davis was on the way. *Id.* at 356. Teague turned down what she believed was the nitrous oxide. Dr. Becker had problems, apparently, with the drill. *Id.* at 357. He then said he would be right back, and got up and walked out. Ms. Callaway went out the back door to the parking area looking for Dr. Becker, and she

came back in and told Teague that Dr. Becker's car was gone. Macsenti was still on nitrous oxide. *Id.* at 358. The departure of Dr. Becker occurred at approximately 6:00 p.m. At around that time Callaway and Teague were discussing what they should do. Callaway then went outside and Dr. Becker's car was there but he could not be found.

Later Becker came back with another gentleman, and at this time plaintiff Macsenti was still on nitrous oxide. Teague and defendant Becker began the procedure again. Heather Davis came in and asked Teague if she was tired and she answered that she was. Teague explained to Davis what had been happening to Dr. Becker. Davis told Teague she could go home, and she left about 8:00 in the evening. *Id.* at 360. On cross-examination, Ms. Teague testified that Macsenti had the nitrous oxide mask off that afternoon when he went to the men's room and also when he was given medication at 1:00 p.m. *Id.* at 367. On cross-examination Ms. Teague restated her testimony that defendant passed out for some ten minutes and one time he was asleep thirty minutes, and Teague was asked whether she saw these instances some 10 to 15 times, and replied: "Yes, sir." *Id.* at 371.

It is undisputed that Dr. Becker left the office around 6:00 p.m. to appear in municipal court on a charge of driving under suspension, even though plaintiff was still in the chair and the procedure had not been completed. When defendant drove back to his office from the court appearance, he was detained by the police and taken to the station to be booked on a new charge of driving under suspension. He finally returned to the office

after 7:00 p.m. and completed plaintiff's procedure. Plaintiff was finally released about 9:00 p.m.

Plaintiff Macsenti testified that he now lives in Escalon, California, having lived earlier in Weatherford, Oklahoma. II App. 527. Macsenti was having some difficulty with one tooth that had "gone bad" on him in June of 1996. He learned about defendant from a phone book ad and called his office. After some delay, he had a brief visit that night with Dr. Becker who told him about root implants. *Id.* at 531. It was agreed he would return to California and would call for an appointment when he returned. The appointment was scheduled for July 15, 1996 and Macsenti arrived at Dr. Becker's office a little before 9:00 a.m. *Id.* at 534.

He was given some medications by Dr. Becker's stepdaughter, Heather Davis. *Id.* at 534. His memory was poor about the events that followed. He had some sensations of a jarring that got his attention, a pinching on his lip, and a hurting. *Id.* at 535. He remembered some conversations about coffee and some giggling at some point. *Id.* at 535.

Macsenti remembers leaving the doctor's office and the next thing that stands out in his memory was a comment that it was 9:00 and Macsenti asked someone "[i]s that real?" II App. 536. He remembered shaking his head and getting in the back of a car. He was told that it really was 9:00. *Id.* at 536. He remembers being given no parting instructions from Dr. Becker's office and no explanations why he had been there for some

12 hours. *Id.* Macsenti was frightened because he did not know what happened to him that day and slept in a chair because he was afraid to lay his head down. *Id.* at 537-38.

Macsenti did not return to work until Saturday following the Monday dental procedure. He did not feel well and had noise in his head and could not concentrate. II App. 541. Later he went to see Dr. Beller and then Dr. Aaron. *Id.* at 541-42. There he complained of being dizzy, lightheaded and off balance. *Id.* at 544-45. He later saw Dr. Ernest Warner, who examined him, and he then had tests done at Baptist Hospital, a blood test and a MRI or CT scan. He later saw Dr. Whatley who conducted some neuropsychological testing. After this he moved to California. *Id.* at 548.

Macsenti testified that after his dental surgery he was having problems and fearful to do jobs. *Id.* at 562. He became fatigued easily. Since the July, 1996 dental surgery with Dr. Becker he has difficulty in building structures and does not have the physical stamina he had earlier for his carpentry work. At times he builds a structure and then a couple of days later his thinking process would go back to start "from scratch again." *Id.* at 568. On visiting Dr. Aaron on August 2, plaintiff related that he was dizzy, lightheaded and off balance. *Id.* at 572. He related to Dr. Simon three days later that he was not in discomfort. On August 28 on revisiting his family doctor, Dr. Aaron, he reported dizziness and feeling as though he had the flu at times. II App. 572. When he visited a Dr. Stephen, a dentist at a Putnam City dental group, plaintiff said he was in "good" health on the questionnaire. *Id* at 573.

Macsenti saw Dr. Ernest Warner on September 5, 1996 and reported that he could not figure out the construction of "dados," joints used in construction, and he had to read instruction material several times because of trouble concentrating and retaining what he has read. *Id.* at 576. In a journal that Macsenti prepared within a week after July 15, 1996 he recorded numerous times that he was dizzy, off balance and was "scared" because he did not know what was wrong with himself. *Id.* at 578.

In support of his claim of injury by Dr. Becker's procedure, plaintiff offered testimony of Dr. Ernest G. Warner, Jr. Dr. Warner is a neurologist who has had experience in that field since 1961. II App. 600. He practices at Baptist Hospital in Oklahoma City, *inter alia.* His work includes being the medical director of Baptist Rehabilitation Unit where he works with people with brain damage. *Id* at 601. He explained that a hypoxic injury results from too little oxygen being in the blood for the brain. From the history given by plaintiff, Dr. Warner had an opinion within a reasonable degree of medical probability that Macsenti received hypoxic insult or brain damage as a result of the July 15 procedure. *Id.* at 604-05. Macsenti's problems and his brain injury were consistent with other hypoxic brain injuries which Dr. Warner had treated. *Id.* at 608.

Dr. Warner noted that Macsenti had received halcion and mepergan fortis, which is a combination of demerol and phenergan. II App. 608. All three drugs are sedatives. The dosage of halcion received by Macsenti was more than Dr. Warner would "certainly

prescribe." *Id.* at 609. Dr. Warner said that he would not give a patient mepergan fortis and halcion at one time as administered to Macsenti. *Id.* at 610. Dr. Warner said that Macsenti has mild brain damage with which his complaints were consistent. *Id.* at 616-17. He has been improving but Dr. Warner testified he did not believe the condition would ever clear up completely. *Id.* at 618. Macsenti suffers from depression, was confused and slow in thinking. *Id.* at 622-24. Dr. Warner agreed that Macsenti's illness could have existed before he saw Dr. Becker. *Id.* at 629.

In response to plaintiff's experts, Dr. Sullivan and Dr. Warner, defendant offered testimony by his experts including Dr. Thomas Whitsett. He is a physician on the faculty of the University of Oklahoma College of Medicine. III App. 839. Dr. Whitsett sees a few private patients. He testified concerning a textbook of internal medicine by Harrison, and a statement that hypoxia, the medical term for reduced oxygen in the blood, rarely if ever causes permanent damage to the nervous system. *Id.* at 840. He opined that diffusion hypoxia is said to occur primarily in people breathing a low level of oxygen, 21% or less, and if they are breathing higher levels of oxygen as in Macsenti's case, diffusion hypoxia does not occur. *Id.* at 844. Referring to an article found in Dr. Warner's files, tests were reported on a mixture of 50% nitrous oxide and 50% oxygen which produced no evidence of diffusion hypoxemia. *Id.* at 849. From a test at 79% nitrous oxide and 21% oxygen (such as was breathed in the courtroom) there was a modest amount of diffusion hypoxia. *Id.* at 850. The medications under discussion can

depress the central nervous system.  Dr. Whitsett said that use of merpergan fortis and halcion in a dental setting was appropriate.  *Id.* at 854.  Dr. Whitsett said that he had reviewed the dosages Dr. Becker used on July 15, 1996 and they were not improper overdoses.  *Id.* at 856-57.  He felt that the drugs were safely given together in those dosages.  He said that he thought that Dr. Warner and Dr. Sullivan were way off the scientific base in concluding that halcion, mepergan fortis, and nitrous oxide, administered in combination over a period of time, caused Macsenti to suffer hypoxic insult.  III App. 890-91.

On cross-examination, Dr. Whitsett stated that he had never treated or examined Macsenti, had not reviewed his dental x-rays, and had not reviewed any training or emergency protocols at Dr. Becker's office.  *Id.* at 874.  Dr. Whitsett had not performed any dental implant surgery or provided any anesthetic services of the nature used for a patient in a dental implant procedure.  He conceded that Dr. Becker leaving his patient at about 6:15 on July 15, 1996 to go to traffic court was an irregular thing to do.  *Id.* at 875.  It was inappropriate to leave Macsenti in the hands of the assistant who was on the job for her first day and an insurance clerk.  *Id.* at 876-77.

Defendant also presented testimony by a clinical psychologist, Dr. David Edwin Johnsen.  He said that he has been a licensed psychologist since 1989 in Oklahoma.  A psychologist typically deals with a variety of psychological and psychiatric disorders.  III App. 900-901.  His graduate training focused on neuropsychology which is the study of

brain behavior relationships. *Id.* at 901.

Dr. Johnsen had reviewed records of Mark Macsenti and a neuropsychological evaluation performed by Dr. Whatley at the defendant's request. He did not personally meet or test Macsenti. *Id.* at 902. He reviewed the test score data and Dr. Whatley's report. From the review of the data Dr. Johnsen opined that there were areas of dysfunction that appeared to be occurring with Macsenti which appeared relatively mild in severity. III App. 905-06. A mild dysfunction means that it is difficult for the person to perform a certain task. Macsenti had mild memory difficulties and some visual, perceptual and attention difficulties noted on certain tests. On the Conners' Continuance Performance Test, Macsenti was in the impaired range. *Id* at 907. He did well on other tests including ability to perform mental arithmetic, conception, *et al.* "within the average range." *Id.* at 907. The indication is that he had a "mild problem" as opposed to a severe problem. Macsenti performed within the average range on a picture puzzle test and was able to perform a block design subtest. *Id.* at 909.

Dr. Johnsen further testified that such problems could be produced by old injuries to the head or exposure to inhalants. Mild impairment such as Macsenti had could have possibly preexisted July 15, 1996. *Id.* at 911. The mild impairment identified may have had an effect in terms of speed at which Macsenti is able to perform work he has been doing. From the data he saw nothing to indicate he is incapable of performing his activities but it might just take him longer to do them. *Id.* at 912.

Dr. Johnsen saw no evidence of malingering by Macsenti. III App. 925-26. Macsenti's test results are consistent with somebody who has suffered hypoxic insult. Dr. Johnsen did not know the cause of such hypoxic insult. He found Macsenti's test results to be mild in brain impairment which was still brain impairment. *Id.* at 926. Macsenti did poorly on a test requiring shifting back and forth between different tasks, which was one of the tests he did most poorly on. *Id.* at 927. Macsenti appeared to be mildly depressed. *Id.* at 929. Any disagreement between Dr. Whatley and Dr. Johnsen was as to the degree of impairment. Macsenti has some dysfunction based on Dr. Johnsen's review of the tests. *Id.* at 929-30.

Defendant's evidence concerning the events of July 15 contrasted sharply with plaintiff's evidence on several major points. For example, both defendant and Heather Davis (who was defendant's step-daughter as well as having been his dental assistant for several years) testified that she was present and assisting defendant during the procedure. Davis denied that defendant passed out during the procedure. III App. 820. Defendant testified that it would not have been possible for him to have completed the procedure had he been under sedation, falling asleep, or drunk. *Id*. at 988-89. He said that Teague and another former employee who had testified that he passed out during plaintiff's procedure had not told the truth. *Id*. at 1007-09. Defendant attributed the length of the procedure to equipment problems he experienced during the day and plaintiff's failure to pre-medicate.

Further evidence will be discussed as necessary for our analysis of the legal issues

raised on appeal.

## II

Defendant's first argument is that the district court committed error by admitting expert evidence on the contested issue of causation without first having made threshold determinations that the testimony was reliable and would be helpful to the jurors, an argument based on *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendant did not object to the testimony when it was admitted during trial. He raised his *Daubert* argument after the close of all the evidence by a motion to strike Dr. Sullivan's testimony about diffusion hypoxia, and by a motion for judgment as a matter of law, presented also at the conclusion of all of the evidence. III App. at 1033-34. Consequently, we will review the admission of the expert testimony only for plain error. *See Goebel v. Denver & Rio Grande W.R.R.*, 215 F.3d 1083, 1088 n.2 (10th Cir. 2000).

Defendant's attack is focused primarily on the testimony of Dr. Stephen Sullivan, a professor of oral surgery at the University of Oklahoma and a practicing dentist. Dr. Sullivan teaches pain and anxiety control to dentistry students, as well as oral surgery. He deals specifically with the areas of anesthetics that can be used in dental procedures. III App. 655. He does quite a bit of dental implant surgery in his practice. *Id.*

Dr. Sullivan's opinion was that plaintiff had suffered brain injury from diffusion hypoxia,[1] with the use of multiple drugs, III App. 679, 689-90, and that the diffusion

---

[1]Hypoxia is defined as the "reduction of oxygen supply to tissue below physiological

(continued...)

-14-

hypoxia resulted from the combination of medications administered to plaintiff, which he described as "absurd," in combination with prolonged use of nitrous oxide.[2] *Id.* at 664-65. Dr. Sullivan testified that administering the medications given and nitrous oxide was below the accepted standard of care for such a case. *Id.* at 668. Leaving the building and plaintiff during the procedure was grossly negligent conduct. *Id.* at 684. Dr. Sullivan said that the plaintiff had been given four central nervous system depressants,[3] and that a depressed respiration rate and shallower breathing were well known effects of central nervous system depressants.

Dr. Sullivan's credentials are not challenged. Defendant focuses his attack on the absence of professional literature to support his opinion and asserted conflicts between portions of Dr. Sullivan's reasoning and principles which do find support in the professional literature. Defendant's positions disputing Dr. Sullivan's opinions were energetically developed at trial through cross-examination of Dr. Sullivan and through the testimony of defendant's own experts, *inter alia*.

On careful review of this record, we find no plain error such as to excuse a timely

---

[1](...continued)
levels despite adequate perfusion of the tissue by blood." *Dorland's Illustrated Medical Dictionary* 812 (28th ed. 1994). Diffusion is described as "the process of becoming diffused or widely spread . . . ." *Id.* at 466.

[2]Nitrous oxide is defined as an "odorless gas that is a weak inhalational anesthetic . . . ." *Id.* at 1140.

[3]The medication having the trade name of mepergan fortes is a combination of two drugs. As noted earlier, plaintiff was also given the medication known as halcion.

*Daubert* objection to plaintiff Macsenti's expert testimony. We are convinced that Defendant forfeited the opportunity to subject the expert testimony of Dr. Sullivan and plaintiff's other experts to a *Daubert* challenge by failure to make a timely objection before that testimony was admitted. After rejecting the "general acceptance" standard long applied from *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), *Daubert* concluded:

> To summarize: "General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence – especially Rule 702 – do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Thus the trial judge is assigned the task of insuring that an expert's testimony rests on a reliable foundation and is relevant, but *Daubert* does not mandate an inquiry questioning and challenging the scientific proffer absent a timely request by an objecting party.

It is true that in *Hoult v. Hoult*, 57 F. 3d 1, 4 (1st Cir. 1995), the First Circuit observed that "[w]e think *Daubert* does instruct district courts to conduct a preliminary assessment of the reliability of expert testimony, even in the absence of an objection. We do not think, however, that district courts are required, *sua sponte*, to make explicit on–the–record rulings regarding the admissibility of expert testimony." *Id.* at 4-5. The First Circuit added that "[r]ather, we assume that the district court performs such an analysis *sub silentio* throughout the trial with respect to all expert testimony." *Id.*

-16-

We note that there are other circuit opinions that have reached the same conclusion as we do – namely that a decision to admit expert opinion evidence will be reviewed only for plain error when objections under *Daubert/Kumho* are not timely made. In *Christopher v. Cutter Laboratories,* 53 F.3d 1184 (11th Cir. 1995), the Eleventh Circuit dealt with problems similar to those in our record relating to *Daubert.* The court cited *Daubert* and said that "there is no question that several of [a medical expert's] statements, viewed in isolation, were statistically invalid and, as such, that the district court should not have admitted them." 53 F.3d at 1191.

However, in *Christopher* the court noted that with respect to the medical expert's testimony, it was very clear that the defendant made no objection that the evidence was statistically inaccurate, *id.* at 1192; that the defendant filed no motion in limine challenging the expert's proposed testimony; and that defendant did not raise any contemporaneous objections. The Eleventh Circuit concluded that "[i]n order to preserve this issue on appeal, [the defendant] must have objected to the challenged testimony." *Id.* The court emphasized that

> If [the defendant] believed the medical testimony was statistically invalid, it should have objected to that testimony, giving [the witness] the chance to explain his answers. Objecting would also have provided the district court with the opportunity not only to make a ruling on the accuracy and admissibility of the challenged testimony, but also to clarify that testimony.

*Id.* The court held that absent an objection, it could review the challenged evidence only for plain error, which the trial judge did not commit.

The Ninth Circuit also issued a decision under *Daubert* which is persuasive here. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir. 1996). There the district court had issued a permanent injunction enjoining Pacific Lumber Company from harvesting trees in an environmentally sensitive area. The logging was found to be a threat that would harass and harm the marbled murrelet and would cause a "take" of the birds in violation of the Endangered Species Act. Pacific Lumber appealed, arguing, *inter alia*, the evidence was insufficient as required proof of harm, principally that the proof failed to meet the standard for reliable scientific evidence under *Daubert*. *Id.* at 1066. The Ninth Circuit recognized that unreliable evidence is necessarily insufficient, but held that "the appropriate time to raise *Daubert* challenges is the trial. By failing to object to evidence at trial and requesting a ruling on such an objection, a party waives the right to raise admissibility issues on appeal." *Id.* at 1066.

The court noted that by failing to request a ruling in the district court on its *Daubert* objections, Pacific Lumber evaded the district court's decision on the issue and denied the Environmental Protection Information Center the opportunity to lay a better foundation for the evidence. *Id.* at 1067. The court held that permitting Pacific Lumber to challenge the reliability of the scientific evidence under *Daubert* on appeal, in the guise of an insufficiency of the evidence argument, would give Pacific Lumber an unfair advantage. The *Daubert* argument was rejected. *Id.* at 1067. We feel that the holding is most persuasive here where we have similar circumstances in that defendant Becker

failed to make timely *Daubert* objections below, depriving the trial judge of the opportunity to make a *Daubert* analysis and denying plaintiff Macsenti an opportunity to support the reliability and relevance of his evidence by further proof and argument.

Our court discussed the admissibility of evidence in light of the *Daubert* and *Kumho* requirements in *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277 (10th Cir. 2000). We noted, *id.* at 1289, the Supreme Court's statement in *Daubert* that even after evidence is initially admitted, "in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment . . . . " 509 U.S. at 596. We said, however, that we did not read this statement in *Daubert* as overriding the general requirement of a timely objection to the evidence and that a "party may waive the right to object to evidence on *Kumho/Daubert* grounds by failing to make its objection in a timely manner." 201 F.3d at 1289-90.[4]

Later in *Goebel v. Denver and Rio Grande W.R.R. Co.*, 215 F.3d 1083 (10th Cir. 2000), this court dealt again with the *Daubert/Kumho* issue. On that record we held that there was an abuse of discretion in admitting expert testimony because of the lack of *Daubert* analysis and findings on admissibility. However we made it clear that:

> [W]e specifically hold that a district court *when faced with a party's objection,* must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.

---

[4]Our rejection of the *Daubert* argument in *Questar* was actually based on the fact that Questar did not show that the witness's testimony was offered as expert testimony. *Id.* at 1290.

*Id.* at 1088 (emphasis added and footnote omitted). Thus we did not hold that a *Daubert* analysis was required *sua sponte* but noted that enforcement of the requirement for the *Daubert* analysis was premised on "a party's objection." *Cf. United States v. Velarde,* 214 F.3d 1204, 1209 (10th Cir. 2000) (abuse of discretion to admit expert testimony where the record revealed no *Daubert/Kumho* reliability determination although *Kumho* was specifically called to the trial court's attention).

Here the *Daubert* objection to expert testimony, specifically that of Dr. Sullivan, was made at the *close* of evidence, as Appellant's Opening Brief, p. 29-30, specifically states. Counsel for defendant Becker *after* conclusion of the evidence there said he had two motions, one a *Daubert* motion to exclude all the evidence of Dr. Sullivan about diffusion hypoxia because it "flies in the face of all scientific knowledge literature about it." III App. 1033. The other motion was for judgment as a matter of law in favor of the defendant, this being presented immediately after the motion to exclude Dr. Sullivan's testimony on diffusion hypoxia. The trial court denied the motions. *Id.* at 1034. The judge addressed the request to exclude Dr. Sullivan's testimony under *Daubert*, stating: "I think the time to make that motion is before he testifies." *Id.* at 1033.

We are convinced that the motions were untimely here.[5] By waiting until after the

---

[5]Defendant seems to try to justify his failure to make contemporaneous objections at trial on the *Daubert* issue by asserting that he was surprised by a change in Dr. Sullivan's theory, his testimony at trial allegedly being in conflict with testimony he had previously given before the Oklahoma Board of Dentistry. On its face, however, this rationalization fails: If the testimony

(continued...)

close of all the evidence to raise the *Daubert/Kumho* objection, basic errors occurred.

The proponent of the evidence was deprived of the opportunity to offer other supporting

proof from Dr. Sullivan and from literature. Moreover the trial judge was disadvantaged

in that she was not alerted to the need of stating *Daubert/Kumho* findings and analysis.

And, obviously, appellate review by us is impaired as well, due to the inadequacy of the

record. Accordingly on this record and persuasive precedent we hold that the

*Daubert/Kumho* objection was waived, and our review is only for plain error.

On careful review of this record, we find no plain error in the rejection by the trial

judge of the belated *Daubert* objection. Dr. Sullivan's general theory was that the injury

here resulted from the excessive combined use of central nervous system depressants.

His opinion on the specifics of this case, in the absence of published studies on this

precise combination of medications and prolonged use of nitrous oxide, was not so

manifestly unreasonable that its admission constituted plain error. *See Christopher v.*

*Cutter Laboratories*, 53 F.3d at 1192.

---

[5](...continued)
was unexpected and a departure from the witness's previously expressed opinion, that would
seem to amplify the motivation to raise the issue at once. Objection should have been made *at
the latest* when the allegedly new and different explanation was given at trial.

  This would have given the trial judge the opportunity to evaluate the basis of the
testimony and would have given the plaintiff the opportunity to provide further foundation for the
testimony. We also note that defendant had taken Dr. Sullivan's deposition before trial and
explored the basis for his opinion, *see* III App. 692-93, and in opening statement characterized
Dr. Sullivan's theory as "junk science," II App. 328. In short, we are not convinced that
defendant was surprised by the trial testimony, but in any event nothing excuses the failure to
make timely objection at trial.

## III

We next address defendant's contention that the judgment entered on the jury verdict gave plaintiff an impermissible double recovery. The verdict form separately asked the jurors if they found for plaintiff or for defendant on the plaintiff's theories of negligence and intentional infliction of emotional distress, and separately asked the amount of damages on each theory. In her charge on damages, the judge instructed the jury, *inter alia,* that:

> The plaintiff has asserted two separate claims for damages under different legal theories. The Court has given you separate instructions on these legal theories and provided you with a verdict form on which you must indicate your decision on each claim. However, plaintiff may only recover once for any one item.

I App. 126. The jury found for the plaintiff on both the negligence and intentional infliction of emotional distress theories and set the damages at $500,000 on each.[6]

---

[6]The verdict filed in this case read as follows in pertinent part (I App. at 136-137):

Verdict Form

I.

We the jury, duly empaneled and sworn in the above entitled cause, do, upon our oaths, as to plaintiff's negligence claim, find:

   X           For plaintiff Mark Macsenti and against defendant Jon D. Becker and award him damages in the amount of $500,000.

-OR-

             For defendant Jon D. Becker and against plaintiff Mark Macsenti.

II

We, the jury, duly empaneled and sworn in the above entitled cause, do, upon our oaths, as to plaintiff's intentional infliction of emotional distress claim, find:

(continued...)

The form of judgment entered by the clerk (*see* Fed. R. Civ. P. 58) listed these decisions separately, along with the jury's award of $300,000.00 in punitive damages. The parties construe this as a judgment for $1.3 million, and we agree because it is clear by the district judge's post-trial order and her comments in the record that the trial judge also thus construed the verdict and judgment.[7] Defendant now contends that it was error

---

[6](...continued)

  X        For plaintiff Mark Macsenti and against defendant Jon D. Becker and award him damages in the amount of $500,000.
                                    -OR-

        For defendant Jon D. Becker and against plaintiff Mark Macsenti.

III.
(To be completed only if you award plaintiff damages in Section I or II above)

We, the jury duly empaneled and sworn in the above entitled cause, do, upon our oaths, find in favor of the plaintiff Mark Macsenti as follows:

2.      We do X do not ___ (check one) find by clear and convincing evidence that the defendant, Jon D. Becker, acted in reckless disregard of the rights of others.

June 12, 1998
   Date

[7]After the verdict for the damages of $500,000 on both the negligence and intentional infliction of emotional distress claims were returned, *see* note 6, *supra*, there were some discussions by counsel in chambers with the trial judge. In proceedings that followed in open court but out of the presence and hearing of the jury the judge stated:

    THE COURT: I think we need to redo on the record the discussion we just had in chambers beginning with Mr. Dawson's argument that the verdict actually is–should be construed as a verdict of $500,000 rather than $1 Million, to which plaintiffs object. Is that a fair statement?
    MR. OLSON: That's correct, your Honor.
    THE COURT: It's my opinion that the instructions on damages tell them that they cannot award - - that plaintiff may only recover once for any one item but they are to indicate their decision on each claim. To me, that clearly results in the

(continued...)

to add the two amounts of $500,000 in actual damages on the two theories of negligence and intentional infliction of emotional distress. Defendant says that there was no proof of different injuries to support recovery on both theories and insists this is a double recovery. We disagree.

We do not believe that the verdict here is inconsistent on its face. Consequently, we agree with the district court's analysis of this issue. The trial judge, noting that there was no contention of improper or inadequate instructions to the jury, concluded that the double recovery argument fails because courts "must assume that the jury performed its duty in accordance with those instructions." Dist. Ct. Order at 4, I App. 303. The jury here was properly instructed to avoid granting a double recovery by awarding recovery only once for each item of injury. We see no error in the district court's conclusion that the jurors followed the instructions and found separate injuries arising from the negligence of the defendant and from the intentional infliction of emotional distress by him.

Defendant also contends that there was no evidence of distinct injuries on which

[7](...continued)
$500,000 being imposed twice, once for each cause of action. I have offered to submit an interrogatory to the jury to make certain that is their intent in case they misconstrue these instructions, and Mr. Dawson has objected to them. In the face of his objections, I will not do it. Is that a fair statement, Mr. Dawson?
    MR. DAWSON: Yes, your Honor.
IV App. at 1074. As explained in the text, we agree with the trial judge's construction of the verdict, namely, that the verdict, in light of its form and the instructions given to the jury on damages, shows clearly the jury's intent to award recovery for the plaintiff of $500,000 on each of the two claims, one for negligence and one for intentional infliction of emotional distress.

the separate verdicts for damages for negligence and intentional infliction of emotional distress could properly have been based. This argument is without merit. Plaintiff produced evidence that he had suffered brain damage as a result of negligence as discussed in Part II, *supra*. Plaintiff's evidence of severe emotional distress is discussed *infra* in Part VI. We conclude that the jurors could have found separate injuries from the negligent performance of the dental procedure and from the outrageous and reckless acts which added severe emotional distress to the underlying injuries. Because we conclude that the jurors could have found distinct injuries, we, like the trial judge, construe the verdict as evidence that they did so.

In sum, then, we hold that there was no error in construing the jury's decision as a verdict for one million dollars in compensatory damages, and we hold that the evidence was sufficient to support that verdict.

**IV**

Defendant contends that the trial court erred in denying his motion for a new trial because the verdict was against the weight of the evidence and was a result of passion and prejudice caused by the erroneous admission of irrelevant and unfairly prejudicial evidence. The contention that the verdict was against the weight of the evidence is patently without merit when the evidence is viewed in the light most favorable to the plaintiff, which of course is the proper standard of review. Accordingly, we turn to the contention that defendant was unfairly prejudiced by erroneous rulings on the admission

of evidence. We review the district court's evidentiary rulings for abuse of discretion and will reverse only if we have a firm and definite belief that the trial court made a clear error in judgment. *See Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1433 (10th Cir. 1993).

## A

The first testimony of which defendant complains was that of Ms. Holly Stratton, a former dental assistant for defendant, who testified that on July 3, 1996, twelve days before plaintiff's treatment, she came to work in the morning and found defendant asleep in a dental chair with a nitrous oxide mask on his face. Stratton had worked for defendant for about five years, but July 3, 1996, was her last day in his employ. Stratton testified generally that defendant kept irregular office hours and sometimes canceled patients' appointments. She also testified that she twice had to drive patients home, but no explanation of these occasions was given because the trial judge sustained defendant's objection to further testimony on this topic on the basis that the events were too remote in time.

We will consider these three topics of testimony by Stratton in reverse order. As to the last, we see no abuse of discretion. The trial judge sustained defendant's objection, preventing plaintiff from eliciting the specifics of the instances. Thus, we are left with the mere testimony that within the last two years of her employment, Stratton twice had to drive patients home, testimony which defendant did not move to strike. We do not see an

abuse of discretion in the mere fact that the trial judge did not *sua sponte* strike this tidbit of evidence. Moreover, even if there were an abuse of discretion, because of the minimal amount of information conveyed to the jury, the error would no doubt be harmless. *See* 28 U.S.C. § 2111.

In ruling on defendant's motions in limine prior to trial, the district judge had indicated, without explanation, that she would allow evidence of irregular business practices by defendant going back to 1992, four years before the date of the procedure in question. Plaintiff has offered no argument in support of the ruling on the evidence of irregular hours and canceled appointments going back so far. Nevertheless, this snippet of evidence was quite inconsequential in the context of this trial. Accordingly, we conclude that any abuse of discretion in this regard was at most harmless. *Id.*

As for the evidence of Stratton's observation of defendant apparently wearing a nitrous oxide mask on the morning of July 3rd, we infer that the trial judge viewed this evidence as coming within her ruling about erratic or unusual behavior. At the beginning of trial, the judge had announced this ruling on defendant's motions in limine: "Any erratic or unusual behavior, however, immediately before the event – and I'm talking about no more than two weeks before the event – is relevant and admissible." II App. 338-39. Defendant contends, however, that this evidence was completely irrelevant and unfairly prejudicial.

In arguing that the evidence was irrelevant, defendant takes the position that only

evidence of events occurring on the day of plaintiff's appointment should have been admitted. Defendant also refers to an argument made in the trial court by plaintiff that this evidence, and similar evidence, was admissible to show knowledge of co-defendant Heather Davis that defendant Becker was unfit to attempt to perform the procedure on plaintiff on July 15, 1996. Defendant states that the failure to prove a case against Davis undermines this rationale. This point is unpersuasive. Other than arguing for the exclusion of the evidence altogether, defendant cites no other relief he sought from the trial court to mitigate the alleged unfair prejudice. We do not think that the ultimate failure of plaintiff's case against Davis could result in the retroactive nullification of the rationale for admitting evidence to support the plaintiff's claim against her.

We are left with defendant's argument that the evidence should have been excluded because its potential for unfair prejudice substantially outweighed its probative value. Like other evidence discussed *infra*, the incident with the nitrous oxide mask may be generally described as evidence of other bad acts. We note that neither party cites Fed. R. Evid. 404(b), nor are the principles of that rule discussed in any of the briefs. We must infer that the judge felt the evidence admissible under the broad latitude for admission of proof staked out in Rule 404(b) since the judge did not articulate the bases for her rulings on the challenged evidence. We see no abuse of discretion in this evidentiary ruling.

It appears the trial judge determined that this evidence was relevant to plaintiff's theory that defendant was either under the influence of some type of drugs or medication

or was experiencing symptoms of withdrawal. We note that defendant apparently did not request a limiting instruction to the effect that this evidence was to be considered only against Davis, nor did he move to strike the testimony after the trial judge had granted judgment as a matter of law in favor of Ms. Davis at the conclusion of the plaintiff's evidence. On balance, then, we find no abuse of discretion by the trial judge in admitting the testimony.

**B**

We will next address defendant's challenge to the testimony of two Clinton police officers concerning their encounters with defendant Becker. First, Officer Alan McCormick testified that he stopped defendant for driving under suspension on the evening of July 15, 1996. This occurred when defendant left his office, before the procedure being performed on plaintiff had been completed, to make a scheduled appearance at municipal court on a previous charge of driving while under suspension of his license. After the court appearance, a police dispatcher saw defendant getting into his car to drive away and reported this apparent violation. Officer McCormick responded to the report, spotted the red vehicle that had been reported, and began following it. After getting close enough to the red car to identify the defendant as the driver, Officer McCormick turned on his lights to signal him to stop. Defendant did not stop but drove on until he reached his office, about seven blocks from where the officer had begun signaling for him to pull over.

At this point, Officer McCormick said that he approached defendant as he got out of his car and asked to see his driver's license. McCormick testified that defendant produced a credit card instead. McCormick then got defendant to admit that he did not have a valid driver's license. McCormick testified that defendant appeared very sleepy, was unsteady on his feet, and his speech was slurred. McCormick said that he recognized these as possible signs of impairment from alcohol or other drugs. Defendant was then taken to the police station where he was held until he could post bond for the charge of driving under suspension. According to McCormick, defendant never mentioned that he had interrupted plaintiff's procedure and needed to attend to plaintiff.

McCormick further testified that while being booked defendant was required to remove his shoes and that he had to be assisted to keep from falling while doing this. Finally, McCormick opined that defendant was "under some type of intoxicant" at the time, although there was no detectable odor of alcohol. As defendant was leaving the police station, McCormick told him that he had a problem and needed to get some help; defendant was angered by the comment and "just exploded." II App. 427

We see no merit in defendant's contention that this entire episode was irrelevant. Officer McCormick's observations about defendant's condition about the time that he was performing the implant procedure are very clearly relevant to plaintiff's allegations of negligent and reckless behavior. Defendant specifically contends, however, that the comment about defendant having a problem and needing help was irrelevant and

- 30 -

prejudicial. Defendant did not object at trial to this comment, however, and we certainly do not think the additional prejudice from this comment rises to the level of plain error.[8]

Officer Mike Copeland testified on plaintiff's behalf regarding an encounter he had with defendant on July 11, 1996, four days before plaintiff's implant procedure. Officer Copeland was responding to a call from the residence of another Clinton police officer, Officer Kelly. On arriving at Kelly's home, Copeland observed Kelly on his front porch talking with another man. When Copeland sounded his horn, the other man approached his car, and Copeland recognized the man as the defendant. He testified that defendant was staggering as he walked and, when they began conversing, defendant's speech was slurred. Copeland asked defendant if he had been drinking, which defendant denied. Officer Copeland said that defendant's eyes were dilated. Copeland told defendant the he was "taking him into custody on a complaint of public intoxication by other means other [sic] than alcohol." II App. 484. He also stated that it was his opinion that defendant was "impaired on something other than alcohol." *Id*.

There is no statement in our record of the judge's basis for her ruling admitting this testimony, nor does plaintiff in his appellate brief offer any reasoned basis to support the ruling. Defendant argues that the evidence was propensity evidence, inadmissible

---

[8]We find no merit in plaintiff's contention that defendant waived all objections to all of this and other similar testimony by not making a contemporaneous objection at trial. The trial judge made it clear at the start of trial that she would permit evidence of encounters with the police which occurred within two weeks before the date at issue.

under Fed. R. Evid. 404(a), and also that its probative value was substantially outweighed by its potential for unfair prejudice, so that it should have been excluded under Rule 403. We conclude, however, that the admission of the evidence was at most harmless error.

In reaching this conclusion, we do not underestimate the potential for harmful prejudice from this evidence. Our task, though, is to apply the harmless error standard of 28 U.S.C. § 2111 by taking the evidence which was possibly admitted in error in the context of all of the evidence. In that light, we are confident that any error in admission of this evidence was indeed harmless. The damning evidence of defendant's conduct on the date in question was so potent that the added effect of this evidence did not, we believe, affect defendant's substantial rights. 28 U.S.C. § 2111.

We recognize that the damning evidence of defendant's conduct during plaintiff's implant procedure was contested, and we have not overlooked the possibility that erroneously admitted evidence *could have* affected the jury's resolution of that conflict in the evidence. We conclude, however, that the jury was *not* so affected by this evidence of defendant's previous conduct. Defendant simply was unable to present a convincing explanation for some of the indisputable facts, such as the extraordinary length of the procedure and his poor judgment in leaving the office in the middle of the procedure. In the end, we are convinced that the jury would have resolved the conflicting evidence the same way and reached the same verdict even if they had not heard of the encounter with Officer Copeland.

# C

Defendant contends that he was unfairly prejudiced by the admission of evidence of his personal medical records and medical history, including evidence of alleged drug use. This evidence came during the testimony of defendant's physician, Dr. Gary Hays. Dr. Hays testified that he treated defendant in February and March 1996 for injuries sustained in a motorcycle accident and that this treatment included prescribing medication for pain relief. Defendant also came to Dr. Hays for help in his efforts to lose weight and Dr. Hays prescribed another medication for that purpose.

Our first step in considering challenges to evidentiary rulings is to determine whether the issue has been properly preserved. Fed. R. Evid. 103(a). This threshold question presents considerable difficulty here. Defendant first moved to exclude this evidence by a motion in limine before trial. As far as we can determine from our record, no ruling was made on the many subjects raised in the written motion until after opening statements had been given at trial. Then, in a conference while the jury was outside the courtroom, the district judge ruled on some of the motions and deferred ruling on the others. Apparently addressing defendant's medical records along with several other categories of evidence, the judge stated:

> [M]edication and evidence of Dr. Becker using medication, all of those, I tell you now, they are granted until I vacate that, which probably will be vacated but I cannot tell from what's before me how much of that is relevant. Do not get into it without approaching the bench.

II App. 341.

During direct examination of Dr. Hays, plaintiff moved for admission into evidence of plaintiff's medical records maintained by Dr. Hays (in their entirety it appears). Counsel for the defendant objected and a bench conference was held. The court inquired about the relevance of evidence concerning the witness's treatment of defendant in March 1996. The explanation by plaintiff's counsel suggested that the evidence would be tied into evidence of a drug test performed on defendant on July 11 or 12, 1996 (a test which is discussed further *infra*). Counsel for the defendant stated: "If you let – I think – well, we would want them in if you let the rest of them in." II App. 496. The judge then ruled all of the records admissible.

A party seeking to preserve for appeal an issue regarding admission of evidence must make a clear objection at trial. Fed. R. Evid. 103(a)(l). Although defendant had done so in his motion in limine, that was insufficient in this case. At the time defense counsel spoke, the only ruling in place was one which, although clearly tentative, was in his favor and barred all of this evidence. It is very difficult for us to discern the meaning of "we would want them in if you let the rest of them in." It appears, perhaps, that defendant intended to say that he would want all of the medical records to come in if the court was going to allow evidence of the results of a drug test reflected in the doctor's file. We will construe the record this way and conclude that defendant has preserved his objection to the evidence of the medications Dr. Hays had prescribed for defendant.

After the July 11 encounter with the Clinton police described in the testimony of

- 34 -

Officer McCormick, defendant voluntarily submitted a urine sample for drug testing. The sample tested positive for the class of drugs including methamphetamine and for a possible opiate. Defendant's cross-examination of Dr. Hays brought out the fact or opinion that the medications prescribed for defendant could have caused these positive test results. We are of course aware that the terms methamphetamine and opiate are strongly suggestive of illegal drug activity. Nevertheless, we again reach the conclusion that any error in the admission of this evidence was harmless.

As with Officer Copeland's testimony, we must address this evidence without the benefit of an explanation from the trial judge for her decision to admit the evidence and without any reasoned argument in plaintiff's brief to support the decision. Our remarks in Part IV-B, *supra*, regarding Officer Copeland's testimony are equally apt here. Without ignoring the potential prejudicial impact of this evidence, we simply are convinced that the properly admitted evidence made a case of such strength for the plaintiff that any error in the admission of this evidence did not affect the outcome of this trial.

## V

### A

Defendant contends that the trial court erroneously excluded evidence of past dealings between him, his wife, and the Clinton police department. He asserts that if admission of the evidence of encounters with the police (evidence described in Part IV-B, *supra*), was proper, then he should have been allowed to present evidence which would

have supported his theory that the police had some vendetta against him, which would have cast doubt on the credibility of the police officers.

Our standard of review is abuse of discretion. Our review of this issue is severely limited by defendant's failure to make a meaningful offer of proof as to the nature of the evidence he wished to have admitted. This issue arose at trial when defendant asked Mrs. Becker if she had met Officer McCormick in 1992. Plaintiff objected and a conference was held at the bench, outside the hearing of the jurors. When asked about the nature of the evidence he was attempting to elicit, counsel for the defendant stated:

> Mr. Dawson: I'm going to talk about this incident, the first time she ever met him she was in the parking lot of the police department and he's banging on her window with his flashlight and she finally opens the door, he draws her out, throws her on the floor and –
> The Court: When did this occur?
> Mr. Dawson: In 1992. And I'm not going to go into other incidents but that this was the start of the problems since then and that as a result of that she was charged with four crimes and that they were all dismissed and settled and the police officer paid her $10 and from that point forward, they have been harassed by the Clinton Police Department. I'm not going into the other . . . events but this is the heated relationship between the Beckers and the policemen. This would give them motive to come into court and say things that aren't true and to arrest Jon Becker and falsely charge him with drug charges.

III App. 951. The court ruled that defendant could not develop this evidence of specific events so remote in time from the transaction at the heart of the case, but that the defendant could "in two questions or less" establish that there had been a "history of trouble" between the Beckers and the local police.

"Proof of bias of a witness is almost always relevant . . . ." *United States v. Abel*,

469 U. S. 45, 52 (1984). Nevertheless, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of . . . confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Here, we think the trial judge was well within her discretion in limiting the evidence defendant could offer to show the history of conflict between the Beckers and the police. It is likely that Officer McCormick's version of the events of 1992 would have been different from that of Mrs. Becker.[9] Thus, permitting the testimony would have created substantial problems, expanding the scope of the trial and quite possibly leading to confusion of the jurors. Under Rule 403 the ruling was not an abuse of discretion.

**B**

Defendant also asserts that the trial court erred in excluding evidence that plaintiff's attorneys had paid at least some of his medical bills. The trial judge apparently ruled that this evidence was inadmissible under the collateral source rule. In their arguments on this issue, both parties seem to assume that the Oklahoma doctrine of collateral source is applicable, and this is correct. As we have observed,

> The admissibility of evidence in diversity cases in federal court is generally governed by federal law. Nevertheless, it is well recognized that

---

[9]In response to defendant's argument, plaintiff's counsel warned of "opening up a Pandora's box" by going into the history of the relations between the police and the Beckers. He said that if the evidence were allowed, he would want to call three police officers in rebuttal. III App. 951.

Congress did not intend the procedural rules to preempt the so-called "substantive" state rules of evidence, such as the parol evidence rule, *the collateral source rule*, or the statute of frauds; although the application of these rules will affect the admissibility of some evidence, they in reality serve substantive state policies regulating private transactions.

*Blanke v. Alexander*, 152 F.3d 1224, 1231 (10th Cir. 1998) (citations omitted and emphasis added).

Defendant asserts that plaintiff's attorneys "paid or agreed to pay Macsenti's neurologists, two psychologists, and a therapist for his medical treatment." Appellant's Opening Brief at 43. Defendant contends that this information should have been admitted for two reasons: to show that the amount of medical expenses which plaintiff claimed as damages were inflated and to show bias of the expert witnesses. However, defendant has almost totally failed to provide an offer of proof which is necessary for our review of this evidence. *See* Fed. R. Evid. 103(a)(2). From a passing reference in the briefs, it appears that this topic was first raised in the district court by a motion in limine made by plaintiff. Defendant has failed to include this motion or any response thereto in the record on appeal. The judge made her ruling from the bench at trial without explanation. Because we do not know what arguments were presented to the district court, we cannot say that the court's rulings were not within its discretion.

We further note that defendant's argument that the alleged payments of expenses for medical treatment (as opposed to expenses of evaluation) are not within the collateral source rule is unpersuasive. Defendant cites no authority for this proposition. While our

research has not disclosed any authority holding specifically that payment of treatment expenses by an attorney is within the collateral source rule in Oklahoma, the language of the Oklahoma cases seems to support that view. *See Denco Bus Lines, Inc. v. Hargis*, 229 P.2d 560, 564 (Okla. 1951) ("the receipt of compensation by the injured party from a collateral source wholly independent of the wrongdoer would not operate to lessen the damages recoverable from the person causing the injury").[10]

## VI

Defendant argues that the trial judge erred in permitting the jury to consider the plaintiff's claim for intentional infliction of emotional distress. In accordance with Oklahoma law, the district judge instructed the jurors that

> [f]or plaintiff to recover from the defendant on this claim, he must prove by a preponderance of the evidence that:
>> 1. The defendant's actions, in the setting in which they occurred, were so extreme and outrageous as to go beyond all possible bounds of decency and would be considered atrocious and utterly intolerable in a civilized society; and
>> 2. That the defendant intentionally or recklessly caused severe emotional distress to plaintiff beyond that which a reasonable person could be expected to endure.
>> The term "emotional distress" means mental distress, mental pain
> and suffering, or mental anguish. It includes all highly unpleasant mental reactions, such as fright, horror, grief, humiliation, embarrassment, anger, chagrin, disappointment, and worry.

I App. 121-22.

---

[10]We must also reject defendant's contention that the judgment should be reversed because of the prejudicial effect of the cumulation of alleged evidentiary errors. We have concluded that any errors were at most harmless in the context of the trial as a whole. Similarly, we hold that the cumulative effect of any errors was at most harmless.

Defendant does not contend that this instruction is inaccurate as a matter of law, but instead maintains that the evidence failed to establish any of the enumerated elements of the claim. The suggestion that the evidence failed to show conduct of the outrageous character required for this claim is quite unpersuasive. We of course view the evidence in the light most favorable to the jury verdict. *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1226 (10th Cir. 2000). We are also mindful at the outset that "[t]he outrageous or extreme character of conduct required may arise from an abuse of a position or a relationship which gives the actor actual or apparent authority over another, or the power to affect another's interest." *Breeden v. League Services Corp.*, 575 P.2d 1374, 1377 (Okla. 1978) (citing *Restatement (Second) of Torts* § 46 comment e (1965)). Here, defendant's position as plaintiff's dentist certainly was one of trust, especially so because for the duration of the treatment plaintiff was under the influence of medications designed and administered to induce a state of "conscious sedation," in defendant's terminology.

The jury could have, and evidently did, decide that defendant was grossly impaired at the time he commenced the delicate dental surgery, to the extent that he lost consciousness as many as ten to fifteen times during the process. Nevertheless, he continued his attempt to complete the surgery, heedless of any danger posed by keeping the plaintiff sedated for such an unexpectedly, and unreasonably, long procedure. We see no merit at all in the contention that this evidence failed to meet the standard of extreme

- 40 -

and outrageous conduct.[11]

Defendant also contends that the evidence failed to show that defendant suffered severe emotional distress. Defendant's characterization of the evidence is that plaintiff testified that he remembered little of what happened on the day of the procedure and only suffered distress from defendant's negligent administration of medications and nitrous oxide. Defendant points out that plaintiff did say that he was upset by his inability to perform the type of tasks that he previously done in his carpentry and construction work; defendant contends that this is simply too insignificant to constitute severe distress and draws a comparison to two reported Oklahoma cases upholding intentional infliction of emotional distress claims.[12]

We conclude, contrary to defendant's assertions, that there was sufficient evidence that plaintiff suffered severe emotional distress. Under Oklahoma law the burden of proof that the plaintiff must bear to succeed on this claim may be partially met in the course of establishing the first element of the claim, the extreme and outrageous nature of the defendant's conduct. Thus, the Oklahoma Supreme Court has said that:

> The extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress episodes took place. Expert medical testimony ordinarily is not required where damages for emotional distress are present. In most cases, jurors from their own experience are aware of

---

[11]For the same reasons, we reject defendant's contention that the evidence was insufficient as a matter of law to support the award of punitive damages.

[12]The cases are *Miller v. Miller*, 956 P.2d 887, 901 (Okla. 1998), and *Chandler v. Denton*, 741 P.2d 855, 867-68 (Okla. 1987).

the extent and character of the disagreeable emotions that may result from a defendant's outrageous conduct.

*Chandler v. Denton*, 741 P.2d 855, 867 (Okla. 1987).

We think this is a case in which jurors from their own experience could easily infer that severe emotional distress would be likely to follow from defendant's conduct, beginning with plaintiff's reaction to the realization that he had been sedated for an extended period of time without explanation. Upon finally being released to go home about 9:00 p.m. after the procedure, plaintiff was confused, unable to comprehend what had happened to him, according to the friend who drove him home. This witness testified that plaintiff kept saying, "'It can't be 9 o'clock. It can't be that late.' He just couldn't figure out what had happened to him that day. He said several times, 'What's happened?'" II App.438-39. Shortly after getting home, plaintiff called another close friend and asked that friend to come get him. When the friend asked where he was, plaintiff replied that he didn't know; the witness said that his telephone's "caller ID" feature revealed that the call had come from plaintiff's own home. *Id*. at 459-60. In the days following the procedure, plaintiff was described by this same friend as often appearing "shaken." *Id*. at 462.

Plaintiff himself testified that the night after the procedure he was frightened because he did not know what had happened to him. *Id.* at 537. He also testified that he slept very little, spending the entire night sitting up in a chair because he was afraid to lay his head down. *Id*. at 537-38. Plaintiff contacted defendant's office asking in vain for an

- 42 -

explanation of what had occurred. Thus, plaintiff both presented evidence of emotional distress resulting immediately after the incident and developed facts and circumstances from which, we hold, the jury could have inferred a reaction of severe emotional distress.

The evidence showed that the emotional distress persisted over the two year interval between the injury and the trial. As a result of the brain injury sustained during the prolonged dental surgery, plaintiff's ability to work was severely curtailed. He experienced great difficulty in concentration and memory, which was illustrated by testimony of specific problems he encountered in trying to perform ordinary tasks. At one time while working on a painting project, he had experienced much frustration over his inability to recall where he had stopped the previous day. His rehabilitation counselor suggested that he use yellow stick-on notes as a memory aid. Before following that suggestion it had taken him a significant amount of time in the morning to determine where he had stopped the previous day and where he should begin on the new day.[13]

There were other examples given, not all of which we shall recount here. Another rather striking illustration, however, was plaintiff's inability to complete the roof of a doghouse,[14] which was contrasted with much more challenging projects which, before the injury, he had been successfully completing as a matter of course. Plaintiff, his rehabilitation counselor, and other witnesses described the frustration which resulted from

---

[13]IV App. 1119.

[14]IV App. 1111-12.

- 43 -

his impairment. Plaintiff's wife testified that plaintiff sang in church, accompanying himself on the guitar, about once every two months. Within the year before trial, he had twice attempted to perform in church and been unable to complete the song, she testified. This, she went on to say, had been "very embarrassing and a humiliating thing for him." III App. 763.

We conclude that the evidence was sufficient for submission of the intentional infliction of emotional distress claim to the jury.

## VII

Defendant contends that both the actual damages and the punitive damages awarded were excessive. Addressing the actual damages, defendant cites the relatively low amount of plaintiff's past medical bills (about $15,000) and plaintiff's history of modest earnings, which were under $10,000 for each of the three years preceding the injury. This argument is unconvincing, however, because defendant ignores other criteria on which the jury could have, and presumably did, base its award.[15] Considering the pervasiveness of the effects of the brain injury on plaintiff, obviously affecting numerous activities and not merely his ability to earn a living, we do not find the damages to be excessive, especially when even the defendant's expert witness acknowledged that the

---

[15]In addition to medical expenses and diminution of earning capacity, the jury instructions listed the following as injuries for which plaintiff should be compensated in the event that the jurors had decided in his favor on the claim: mental pain and suffering, past and future; physical pain and suffering, past and future; and physical condition immediately before and after the incident. The jurors were also told to consider the nature and extent of plaintiff's injuries. I App. 124-25.

test results showed that plaintiff had sustained brain injury. III App. 905-06, 917, 924-25, 926, 929-930. The witness also testified that the test results showed no indication that plaintiff was malingering. *Id.* at 925.

In sum, we see no abuse of discretion in the compensatory damages verdicts, nor do we believe that the compensatory damages were so excessive as to shock the judicial conscience.

The abuse of discretion standard of review also applies to defendant's assertion that the award of $300,000 in punitive damages is excessive. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1249 (10th Cir. 1999). We will not disturb the punitive award unless it is "'so excessive as to shock the judicial conscience.'" *Id.* (quoting *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981)).

One aspect of defendant's argument is that the punitive award was excessive in light of his financial condition. In this case the trial judge reserved the issue of punitive damages for a second stage of trial. Thus, when the jurors deliberated at the end of the first stage, in addition to determining the core liability issues and setting the amount of compensatory damages, they indicated on the verdict form that they found "by clear and convincing evidence that the defendant . . . acted in reckless disregard of the rights of others." I App. 137.[16] At the second stage, defendant testified that the Oklahoma Board

[16]One of the instructions had explained to the jury that there would be a second

(continued...)

- 45 -

of Dentistry had disciplined him as a result of this incident by placing severe restrictions on his license to practice in Oklahoma. The restrictions limit him to practicing under the supervision of another dentist and forbid him from prescribing medications or administering nitrous oxide. Defendant contends that he is effectively barred from practice. Further, he testified that at the time of trial he had no dental practice, no assets, and substantial liabilities including a $70,000 tax lien and two other judgements totaling $12,000.

Defendant argues that in light of his straitened circumstances, punitive damages in the amount of $300,000 manifests the jury's disregard of the trial judge's instruction that the purpose of punitive damages is to punish and not to destroy the defendant. Defendant also refers to other elements of the trial court's instruction on punitive damages and contends that none of the factors which the jury was told to consider support its award. In accordance with Oklahoma law, *see* 23 Okla. Stat. § 9.1(A) (2000 Supp.), the trial judge instructed the jury that it could consider these factors in determining the amount of punitive damages: the seriousness of the hazard to the public arising from defendant's misconduct; the profitability of the misconduct to the defendant; how long the conduct lasted and whether it is likely to continue; whether there were attempts to conceal the misconduct; how aware the defendant was of the conduct and its consequences and how

[16](...continued)
stage for affixing the amount of punitive damages if the jury made this finding. I App. 127-28.

aware the defendant was of the hazard and of its excessiveness; the attitude and conduct of the defendant upon finding out about the misconduct/hazard; and the financial condition of the defendant. I App. 134-35.

Defendant asserts that there was no evidence that his misconduct posed a danger to any other patient; that the incident was not at all profitable and indeed resulted in financial ruin for him; that the incident was isolated and, in view of the restrictions placed upon his practice of dentistry, not at all likely to recur; and that there was no attempt to conceal the misconduct.

Notwithstanding defendant's contentions, we conclude that the seriousness of the misconduct at issue here justifies the jury verdict, and we will not disturb it.[17] We are not persuaded that the $300,000 punitive award was excessive on this record in light of its proper function of punishing the offender and deterring others so as to benefit society. *See Dayton-Hudson Corp. v. American Mutual Liability Ins. Co.*, 621 P.2d 1155, 1158 (Okla. 1980).

## VIII

Plaintiff's cross-appeal raises a single issue – whether the district judge erred by

---

[17]We note also that there was evidence from which the jury could have inferred an attempt to conceal what had occurred. In response to plaintiff's requests for his records, he was told that they had been misplaced. The records were eventually found in defendant's daughter's dresser drawer. Although defendant had an innocent explanation for this oddity – which attributed the event to simple mistake – the jury was of course free to disbelieve that explanation.

not adding prejudgment interest to the award of compensatory damages. Defendant raises only one argument in opposition to this issue, that being that plaintiff waived any such objection to the judgment by not filing a motion under Fed. R. Civ. P. 59(e) with the trial court seeking modification of the judgment.

Defendant's argument is without merit, and the authorities cited are inapposite. We have held that a timely motion to amend the judgment to include prejudgment interest is properly brought under Rule 59(e), and so tolls the time for taking an appeal, because prejudgment interest is considered part of the plaintiff's compensation and is thus part of the merits of the trial court's judgment. *Capstick v. Allstate Ins. Co.*, 998 F.2d 810, 812-13 (10th Cir. 1993). We have also held that after the defendant has filed a notice of appeal, the trial court is without jurisdiction to modify the judgment to add prejudgment interest. *Garcia v. Burlington Northern R.R.*, 818 F.2d 713, 720-22 (10th Cir. 1987). However, defendant cites no authority, nor are we aware of any, which holds that a plaintiff *must* raise this issue by a Rule 59(e) motion in the trial court rather than taking an appeal. The instant case is distinguishable from the authorities on which defendant relies because in this case the plaintiff did bring a timely cross-appeal.

Plaintiff included a request for interest in the complaint. I App. 26. We have indicated that this is sufficient to raise the issue in the district court. *McNickle v. Bankers Life & Cas. Co.*, 888 F.2d 678, 681 (10th Cir. 1989). Prejudgment interest on a federal court's judgment in a diversity case is a matter of state law. *Id.* at 680. Under Oklahoma

law, prejudgment interest in personal injury cases is mandatory, runs from the date of commencement of suit, and is to be awarded at a rate set by statute. 12 Okla. Stat. § 727(E). Therefore, on remand the district court should enter an amended judgment in accordance with section 727 adding prejudgment interest at the statutory rate.

## Conclusion

Accordingly, the judgment of the district court is affirmed except for the failure to award prejudgment interest; the cause is remanded to the district court for entry of an amended judgment including prejudgment interest as proper under Oklahoma law.